## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| THE BOROUGH OF AMBLER,<br><br>              Plaintiff,<br><br>v.<br><br>3M COMPANY; BUCKEYE FIRE EQUIPMENT CO.; CARRIER GLOBAL CORP.; KIDDE-FENWAL, INC.; KIDDE PLC, INC.; RAYTHEON TECHNOLOGIES CORP.; UTC FIRE & SECURITY AMERICAS CORP., INC.; CHEMGUARD, INC.; NATIONAL FOAM, INC.; TYCO FIRE PRODUCTS LP; AGC CHEMICALS AMERICAS, INC.; ARCHROMA U.S., INC.; ARKEMA, INC.; BASF CORP.; CHEMDESIGN PRODUCTS, INC.; CHEMICALS INCORPORATED; THE CHEMOURS CO.; THE CHEMOURS CO. FC, LLC; CLARIANT CORP.; CORTEVA, INC.; DUPONT DE NEMOURS, INC.; E.I. DU PONT DE NEMOURS AND CO.; DEEPWATER CHEMICALS, INC.; DYNAX CORP.; and DOES 1-100,<br><br>              Defendants. | Civil Action No. _____<br><br>**NOTICE OF REMOVAL**<br><br>**JURY TRIAL DEMANDED** |

Defendants Tyco Fire Products LP and Chemguard, Inc. (collectively "Tyco"), by and through undersigned counsel, hereby give notice of the removal of this action, pursuant to 28 U.S.C. §§ 1442(a)(1) and 1446, from the Court of Common Pleas of Montgomery County, Pennsylvania, to the United States District Court for the Eastern District of Pennsylvania.  As grounds for removal, Tyco alleges as follows on personal knowledge as to its own conduct and status and on information and belief as to all other matters:

### PRELIMINARY STATEMENT

1.     Plaintiff Borough of Ambler seeks to hold Tyco and certain other Defendants liable based on their alleged conduct in designing, manufacturing, marketing, distributing, and/or selling

aqueous film-forming foam ("AFFF") that Plaintiff alleges was used at locations in and near the Borough of Ambler—including the former Willow Grove Naval Air Station Joint Reserve Base in Horsham Township ("Willow Grove") and the former Naval Air Warfare Center in Warminster Township (the "Warfare Center")—for fire protection, training, and response activities, thereby resulting in contamination.

2.     Specifically, Plaintiff alleges that Defendants' AFFF contained per- and polyfluoroalkyl substances ("PFAS"), including perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS"), and that the use of these substances at Willow Grove and the Warfare Center caused contamination of Plaintiff's natural resources.

3.     At least some of the AFFF that has been used at Willow Grove and the Warfare Center over the years has been manufactured by a select group of suppliers (including Tyco) in accordance with the military's rigorous specifications ("MilSpec AFFF").  Since the late 1960s, military facilities, including Willow Grove and the Warfare Center, have been required to use MilSpec AFFF for suppression of hydrocarbon fuel fires.   Under the federal "government contractor" defense recognized in *Boyle v. United Technologies Corp.*, 487 U.S. 500 (1988), Tyco is immune to tort liability for its design and manufacture of MilSpec AFFF and its provision of warnings for the product.  Under the federal officer removal statute, 28 U.S.C. § 1442, Tyco is entitled to remove this action in order to have its federal defense adjudicated in a federal forum. *See Papp v. Fore-Kast Sales Co.*, 842 F.3d 805, 810–15 (3d Cir. 2016).  Such removal "fulfills the federal officer removal statute's purpose of protecting persons who, through contractual relationships with the Government, perform jobs that the Government otherwise would have performed." *Isaacson v. Dow Chem. Co.*, 517 F.3d 129, 133 (2d Cir. 2008).

## BACKGROUND

4.      This action was filed on December 13, 2021, in the Court of Common Pleas of Montgomery County, Pennsylvania, bearing Case No. 2021-24289 (Ex. A, Complaint).  Venue is proper in this Court pursuant to 28 U.S.C. §§ 118(a) and 1441(a) because the Court of Common Pleas of Montgomery County, Pennsylvania, is located within the Eastern District of Pennsylvania.

5.      Tyco accepted service on December 15, 2021.  Removal is timely as it is within 30-days of service.

6.      Tyco is not required to notify or obtain the consent of any other Defendant in this action in order to remove Plaintiff's action as a whole under § 1442(a)(1).  *See, e.g.*, *Durham v. Lockheed Martin Corp.*, 445 F.3d 1247, 1253 (9th Cir. 2006); *Hilbert v. McDonnell Douglas Corp.,* 529 F. Supp. 2d 187, 195 (D. Mass. 2008); *Linden v. Chase Manhattan Corp.*, No. 99 Civ. 3970(LLS), 1999 WL 518836, at *1 (S.D.N.Y. July 21, 1999).

7.      Plaintiff generally alleges that certain of the Defendants (the "AFFF Defendants"), including Tyco, have designed, manufactured, marketed, distributed, and/or sold AFFF products, which contain PFAS, including PFOS, PFOA, and/or their chemical precursors.   (Ex. A, Compl. ¶¶ 1, 8, 29–30, 36–39).  Plaintiff alleges that the AFFF designed, manufactured, marketed, distributed, and/or sold by the AFFF Defendants, due to the use of AFFF in fire protection, training, and response activities at Willow Grove and the Warfare Center has caused contamination of Plaintiff's natural resources.  (*Id.* ¶¶ 189–90, 192–93, 195–199, 208).  Plaintiff further alleges that it has incurred and will incur costs associated with investigating, remediating, and monitoring its water infrastructure, waterbodies, and other resources and properties.  (*Id.* ¶¶ 5, 213, 217).

8.      Plaintiff asserts claims against all Defendants for public nuisance (*id.* ¶¶ 218–38), defective design (*id.* ¶¶ 239–57), failure to warn (*id.* ¶¶ 258–76), trespass (*id.* ¶¶ 277–85),

3

negligence (*id.* ¶¶ 286–96), and violation of the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. § 6020.507 (*id.* ¶¶ 297–313).  Plaintiff also seeks punitive damages (*id.* Prayer for Relief).

9.      Pursuant to 28 U.S.C. § 1446(d), a copy of this Notice of Removal is being served upon all parties and a copy is being filed with the Clerk of the Court of Common Pleas of Montgomery County, Pennsylvania.

10.     By filing a Notice of Removal in this matter, Tyco does not waive the rights of any Defendant to object to service of process, the sufficiency of process, jurisdiction over the person, or venue; and Tyco specifically reserves the rights of all Defendants to assert any defenses and/or objections to which they may be entitled.

11.     Tyco reserves the right to amend or supplement this Notice of Removal.

## REMOVAL IS PROPER UNDER THE FEDERAL OFFICER REMOVAL STATUTE, 28 U.S.C. § 1442

12.     Removal here is proper under the federal officer removal statute, 28 U.S.C. § 1442(a)(1), which provides for removal of an action relating to a defendant's acts undertaken at the direction of a federal officer.  Removal is appropriate under this provision where the removing defendant establishes that: (a) it is a "person" within the meaning of the statute; (b) it acted under federal authority; (c) its actions taken pursuant to a federal officer's direction have a causal nexus with plaintiff's claims or injuries or are otherwise related to the lawsuit; and (d) it can assert a "colorable" federal defense.  *Papp*, 842 F.3d at 812; *cf. Mesa v. California*, 489 U.S. 121, 124–25, 129–31, 133–35 (1989); *Cuomo v. Crane Co.*, 771 F.3d 113, 115 (2d Cir. 2014); *Hilbert v. McDonnell Douglas Corp.*, 529 F.Supp.2d 187, 196 (D. Mass. 2008); *Isaacson*, 517 F.3d at 135; *Durham*, 445 F.3d at 1251.

13.     Removal rights under the federal officer removal statute are much broader than under the general removal statute, 28 U.S.C. § 1441.  Suits against defendants acting on behalf of

federal officers "may be removed despite the nonfederal cast of the complaint; the federal-question element is met if the defense depends on federal law." *Jefferson County v. Acker*, 527 U.S. 423, 431 (1999). This is because § 1442(a)(1) protects "the government's need to provide a federal forum for its officers and those who are 'acting under' a federal office." *Albrecht v. A.O. Smith Water Prods.*, No. 11 Civ. 5990(BSJ), 2011 WL 5109532, at *3 (S.D.N.Y. Oct. 21, 2011) (citation omitted). This important federal policy "should not be frustrated by a narrow, grudging interpretation of [§] 1442(a)(1)." *Willingham v. Morgan*, 395 U.S. 402, 407 (1969); *see Durham*, 445 F.3d at 1252. To the contrary, § 1442 as a whole must be "liberally construe[d]" in favor of removal. *Papp*, 842 F.3d at 812 (alterations in original) (internal quotation marks omitted).

14.    All requirements for removal under § 1442(a)(1) are satisfied where, as here, the notice of removal alleges that the plaintiff's injuries are caused at least in part by MilSpec AFFF. *See, e.g.*, *Nessel v. Chemguard, Inc.*, No. 1:20-cv-1080, 2021 WL 744683, at *3 (W.D. Mich. Jan. 6, 2021) (denying motion to remand in AFFF case against Tyco and other manufacturers and holding that, notwithstanding plaintiffs' assertion "that they do not seek resolution of any claims related to MilSpec AFFF[,] . . . Plaintiffs cannot decide what defense Defendants might present"); *Ayo v. 3M Co.*, No. 18-CV-0373(JS)(AYS), 2018 WL 4781145 (E.D.N.Y. Sept. 30, 2018) (denying motion to remand and finding that federal officer removal was proper in a lawsuit against Tyco and other manufacturers of MilSpec AFFF). The court overseeing the *In re Aqueous Film-Forming Foams Products Liability Litigation* multi-district litigation has also found on multiple occasions that removal under § 1442 is proper where the notice of removal alleges that plaintiffs' injuries are caused, at least in part, by MilSpec AFFF. *See* Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 103 (D.S.C. May 24, 2019) ("MDL Order 1"), at 3–6; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 320 (D.S.C. Sept.

27, 2019) ("MDL Order 2"), at 3–5; Order, *In re AFFF Prods. Liab. Litig.*, MDL No. 2:18-mn-2873-RMG, ECF No. 325 (D.S.C. Oct. 1, 2019) ("MDL Order 3"), at 3–6.  Given its experience with the claims and defenses in AFFF litigation, the MDL Court's holdings clearly demonstrate that this case, too, has been properly removed to federal court.[1]

A.      **MilSpec AFFF**

15.     Since the 1960s, the United States military has used MilSpec AFFF on military bases, airfields, and Navy ships—settings where fuel fires are inevitable and potentially devastating—to train its personnel, put out fires, save lives, and protect property.  Indeed, the United States Naval Research Laboratory developed AFFF in response to catastrophic fires aboard the aircraft carriers *USS Forrestal* in 1967 and *USS Enterprise* in 1969.[2]  Decades later, the Naval Research Laboratory described the development of AFFF as "one of the most far-reaching benefits to worldwide aviation safety."[3]

16.     The manufacture and sale of MilSpec AFFF is governed by rigorous military specifications created and administered by Naval Sea Systems Command.  The applicable specification, Mil-F-24385, was first promulgated in 1969, and has been revised a number of times since then.[4]  All MilSpec AFFF products must be qualified for listing on the applicable Qualified Products List prior to military procurement.  Prior to such listing, a manufacturer's products are

---

[1] Following removal, Tyco intends to designate this action for transfer to the MDL.

[2] *See* Press Release 71-09r, U.S. Naval Research Lab., Navy Researchers Apply Science to Fire Fighting (Oct. 23, 2009), https://tinyurl.com/y2jq4q4w.

[3] U.S. Navy, NRL/MR/1001-06-8951, The U.S. Naval Research Laboratory (1923–2005): Fulfilling the Roosevelts' Vision for American Naval Power 37 (2006) ("Fulfilling the Roosevelts' Vision"), https://permanent.fdlp.gov/gpo125428/roosevelts.pdf.

[4] The 1969 MilSpec and all its revisions and amendments through April 2020 are available at https://tinyurl.com/yxwotjpg.

examined, tested, and approved to be in conformance with specification requirements.[5]   The MilSpec designates Naval Sea Systems Command as the agency responsible for applying these criteria and determining whether AFFF products satisfy the MilSpec's requirements.   After a product is added to the Qualified Products List, "[c]riteria for retention of qualification are applied on a periodic basis to ensure continued integrity of the qualification status."[6]   Naval Sea Systems Command reserves the right to perform any of the quality assurance inspections set forth in the specification where such inspections are deemed necessary to ensure supplies and services conform to prescribed requirements.

17.     From its inception until very recently, the MilSpec included the express requirement that MilSpec AFFF contain "fluorocarbon surfactants."   All fluorocarbon surfactants are PFAS, and that category includes PFOA, PFOS, and their chemical precursors—the very compounds at issue in the Complaint here.   This requirement has been in force for virtually the entire time period at issue in the Complaint.   In 2019 the MilSpec removed the modifier "fluorocarbon" from "surfactants," but it expressly states that "the DoD intends to acquire and use AFFF with the lowest demonstrable concentrations of . . . PFOS and PFOA" "[i]n the short term."   PFOA or PFOS are unavoidably present at some concentrations in fluorocarbon surfactants, and the current MilSpec expressly contemplates that AFFF formulations will contain PFOA and PFOS (subject to recently imposed limits).

---

[5] Dep't of Defense SD-6, Provisions Governing Qualification 1 (Feb. 2014), https://tinyurl.com/y5asm5bw.

[6] *Id.*

**B.**     **All the Requirements of 28 U.S.C. § 1442(a)(1) Are Satisfied**

        *1.*     *The "Person" Requirement Is Satisfied*

18.     The first requirement for removal under the federal officer removal statute is satisfied here because Tyco Fire Products LP and Chemguard, Inc. (a limited partnership and corporation, respectively) meet the definition of "persons" under the statute.  For purposes of § 1442(a)(1), the term "person" includes "corporations, companies, associations, firms, [and] partnerships."  *Papp*, 842 F.3d at 812 (quoting 1 U.S.C. § 1); *accord Bennett v. MIS Corp.*, 607 F.3d 1076, 1085 (6th Cir. 2010); *Isaacson*, 517 F.3d at 135–36.

        *2.*     *The "Acting Under" Requirement Is Satisfied*

19.     The second requirement ("acting under" a federal officer) is satisfied when an entity assists or helps carry out, the duties or tasks of a federal officer.  *Papp*, 842 F.3d at 812.  "The words 'acting under' are to be interpreted broadly . . . ."  *Isaacson*, 517 F.3d at 136 (citation omitted).  Federal courts "have explicitly rejected the notion that a defendant could only be 'acting under' a federal officer if the complained of conduct was done at the specific behest of the federal officer or agency." *Papp*, 842 F.3d at 813.

20.     The requirement of "acting under" federal office is met here because the effect of Plaintiff's claims, at least in part, is to challenge Tyco's alleged conduct in providing vital products "that, in the absence of Defendants, the Government would have had to produce itself."  *Isaacson*, 517 F.3d at 137.  MilSpec AFFF is a mission-critical military and aviation safety product that, without the support of private contractors, the government would have to produce for itself.  *See Ayo*, 2018 WL 4781145, at *9 (describing MilSpec AFFF as a "mission-critical" and "life-saving product" used by all branches of the U.S. armed forces and NATO members (internal quotation marks omitted)); *cf. Isaacson*, 517 F.3d at 137.  The Naval Research Laboratory states that, "[a]lthough [it] was responsible for the original concepts and formulations, it was necessary to

elicit the aid of the chemical industry to synthesize the fluorinated intermediates and agents to achieve improvements in formulations."[7]   Accordingly, the military has long depended upon outside contractors like Tyco to develop and supply AFFF.  *See Chemguard*, 2021 WL 744683, at *3 (holding that Tyco and other AFFF manufacturers were "acting under" a federal officer in connection with the manufacture and sale of MilSpec AFFF); *Ayo*, 2018 WL 4781145, at *8–9 (same); *see also* MDL Order 1, at 3–6 (finding that the "acting under" requirement was satisfied because defendant demonstrated that it was manufacturing AFFF under the guidance of the U.S. military); MDL Order 2, at 3–5; MDL Order 3, at 3–6 (same).  If Tyco and other manufacturers did not provide MilSpec AFFF, the government would have to manufacture and supply the product itself.

21.    In designing, manufacturing and supplying the MilSpec AFFF at issue, Tyco acted under the direction and control of one or more federal officers.  Specifically, Tyco acted in accordance with detailed specifications, promulgated by Naval Sea Systems Command, that govern AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Further, the AFFF products in question were subject to various tests by the United States Navy before and after being approved for use by the military and for inclusion on the Qualified Products List maintained by the DoD.[8]

### 3.    *The Nexus Requirement Is Satisfied*

22.    The third requirement, that the defendant's actions taken "under color of federal office" have a causal nexus with plaintiff's claims or injuries or be otherwise related to the lawsuit, erects a hurdle that "is quite low."  *Isaacson*, 517 F.3d at 137.[9]  To satisfy this requirement, it is

---

[7] Fulfilling the Roosevelts' Vision, *supra* n.3, at 37.

[8] *See* Dep't of Defense, SD-6, *supra* n.5, at 1.

[9] The "acting under" and "under color of" prongs overlap.  Both "are satisfied if the actions

sufficient for a defendant to establish that an act that allegedly caused or contributed to the plaintiff's injury occurred while the defendant was performing its official duties. *Id.* at 137–38.

23.    Here, the Plaintiff's claims arise at least in part from Tyco's production and sale of AFFF manufactured to military specifications.  Plaintiff alleges that the use of PFAS in AFFF is the source of its injuries.  Tyco contends that the use of such chemicals in MilSpec AFFF was required by military specifications.  The conflict is apparent: MilSpec AFFF was developed by Tyco, and other manufacturers to meet specifications established by the DoD.  The design choices Plaintiff is attempting to impose via state tort law would create a conflict in which Tyco could not comply with both the MilSpec and the purported state-prescribed duty of care.  *See Boyle*, 487 U.S. at 509; *see also Ayo*, 2018 WL 4781145, at *9 ("[T]here is evidence of a 'casual connection' between the use of PFCs in AFFF and the design and manufacture of AFFF for the government."); MDL Order 1, at 5–6 ("Here, [Plaintiff]'s claims arise out of use of AFFF products that it claims Tyco manufactured and sold, and for which the U.S. military imposes MilSpec standards.  The Court . . . finds that the causation element of federal officer removal is satisfied here."); MDL Order 2, at 5 (finding the causation element of federal officer removal satisfied where Tyco's AFFF products, "for which the military imposes MilSpec standards," were used at several airports); MDL Order 3, at 5–6 (same as to MilSpec AFFF used at a single airport).

24.    Here, Plaintiff's purported injuries arise at least in part from MilSpec AFFF.  The causal connection between Plaintiff's alleged injuries and Tyco's actions under color of federal office is clear.  It is irrelevant that the Plaintiff does not expressly contend that it has been injured by MilSpec AFFF.  Courts "credit Defendants' theory of the case when determining whether [the]

---

subject to suit resulted directly from government specifications or direction." *Albrecht*, 2011 WL 5109532, at *5.

causal connection exists." *Isaacson*, 517 F.3d at 137; *see also Chemguard*, 2021 WL 744683, at *3 (noting that "Plaintiffs cannot decide what defense Defendants might present").

### 4.   *The "Colorable Federal Defense" Requirement Is Satisfied*

25.   The fourth requirement ("colorable federal defense") is satisfied by Tyco's assertion of the government contractor defense.

26.   At the removal stage, a defendant need only show that its government contractor defense is colorable; that is, "that the defense was 'legitimate and [could] reasonably be asserted, given the facts presented and the current law.'" *Papp*, 842 F.3d at 815 (alteration in original) (citation omitted).   "A defendant 'need not win his case before he can have it removed.'" *Id.* (quoting *Willingham*, 395 U.S. at 407); *see also Isaacson*, 517 F.3d at 139 ("To be 'colorable,' the defense need not be 'clearly sustainable,' as the purpose of the statute is to secure that the validity of the defense will be tried in federal court." (citation omitted)); *O'Connell v. Foster Wheeler Energy Corp.*, 544 F. Supp. 2d 51, 54 (D. Mass. 2008) (upon removal, defendant must raise "colorable federal defense").   At the removal stage, the inquiry "is purely jurisdictional, and neither the parties nor the district courts should be required to engage in fact-intensive motion practice, pre-discovery, to determine the threshold jurisdictional issue." *Cuomo*, 771 F.3d at 116.[10] Moreover, "this inquiry is undertaken whilst viewing the facts in the light most favorable to Defendants." *Hagen v. Benjamin Foster Co.*, 739 F. Supp. 2d 770, 783–84 (E.D. Pa. 2010). "Precisely in those cases where a plaintiff challenges the factual sufficiency of the defendant's

---

[10] *See also Kraus v. Alcatel-Lucent*, No. 18-2119, 2018 WL 3585088, at *2 (E.D. Pa. July 25, 2018) ("A court does not 'determine credibility, weigh the quantum of evidence or discredit the source of the defense' at this stage.   Instead, [the court] only determine[s] whether there are sufficient facts alleged to raise a colorable defense." (internal citation omitted)).

defense, the defendant should 'have the opportunity to present [his] version of the facts to a federal, not a state, court.'" *Cuomo*, 771 F.3d at 116 (alteration in original) (citation omitted).

27.     Under the government contractor defense, the defendant is not liable for the design, manufacture, or warnings of equipment or supplies "when (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States." Boyle, 487 U.S. at 512.

28.     Tyco has satisfied these elements for purposes of removal.  As discussed above, Naval Sea Systems Command approved reasonably precise specifications, governing MilSpec AFFF formulation, performance, testing, storage, inspection, packaging, and labeling.  Tyco's products appeared on the DoD Qualified Products List, which could have happened only if Naval Sea Systems Command had first determined that they conformed to the MilSpec.  *See Ayo*, 2018 WL 4781145, at *13 ("[T]here is colorable evidence that Manufacturing Defendants' Mil-Spec AFFF is not a stock product and that the government approved reasonably precise specifications requiring them to use PFCs, including PFOS and PFOA, in their products."); *see also id.* ("There is also colorable evidence . . . that Manufacturing Defendants' AFFF products conformed to the government's reasonably precise specifications."); MDL Order 1, at 5 (finding defendant demonstrated a colorable defense "where it contends that its AFFF products were manufactured according to the U.S. military's MilSpec specifications"); MDL Order 2, at 4 (same, as to Tyco); MDL Order 3, at 5 (same); *see also Chemguard*, 2021 WL 744683, at *4.

29.     Moreover, the government was sufficiently informed regarding alleged product-related "dangers," *Boyle*, 487 U.S. at 512, to exercise its discretionary authority in specifying and procuring MilSpec AFFF.  The military specifications have long included testing protocols and

requirements for toxicity, chemical oxygen, and biological demand.  Indeed, it is clear that the United States has long understood that AFFF contains PFAS and may contain or break down into PFOS and/or PFOA; that AFFF constituents can migrate through the soil and potentially reach groundwater; and that it has been reported that this may raise environmental or human health issues.[11]  For example, as early as October 1980, a report supported by the U.S. Navy Civil Engineering Laboratory, U.S. Air Force Engineering Service Center, and the U.S. Army Medical Research and Development Command stated that AFFF contained fluorocarbons and that "[a]ll of the constituents resulting from fire fighting exercises are considered to have adverse effects environmentally."[12]  By no later than 2001, DoD was aware of data purportedly showing PFAS compounds in MilSpec AFFF to be "toxic" and "persistent."  In 2002, the United States Environmental Protection Agency issued a draft hazard assessment for PFOA, which reviewed in detail, among other data, human epidemiological studies and animal toxicology studies pertaining to alleged associations between PFOA and cancer.  More recently, in a November 2017 report to Congress, the DoD acknowledged the concerns raised by the EPA regarding PFOS and PFOA. Nonetheless, it still described AFFF containing PFOS or PFOA as a "mission critical product [that] saves lives and protects assets by quickly extinguishing petroleum-based fires."[13]  Indeed, Naval Sea Systems Command continues to require that MilSpec AFFF contain "surfactants," and recognizes that PFAS, including PFOS and PFOA, will be present (subject to recently imposed

---

[11] *See, e.g.*, EPA, *Revised Draft Hazard Assessment of Perfluorooctanoic Acid and Its Salts* 1–6 (Nov. 4, 2002).

[12] *See* Edward S. K. Chian et al., *Membrane Treatment of Aqueous Film Forming Foam (AFFF) Wastes for Recovery of Its Active Ingredients* 1 (Oct. 1980), https://apps.dtic.mil/dtic/tr/fulltext/u2/a136612.pdf.

[13] Dep't of Defense, *Aqueous Film Forming Foam Report to Congress* 1–2 (Oct. 2017) (pub. Nov. 3, 2017), https://tinyurl.com/wshcww4.

limits for PFOS and PFOA) in AFFF formulations.[14] *See Ayo*, 2018 WL 4781145, at *12 ("That the DoD knows of the alleged risks of PFC-based AFFF products but continues to purchase them supports the position that the government approved reasonably precise specifications for the claimed defective design."); MDL Order 1, at 5 ("As to whether [defendant] adequately informed the U.S. military of dangers associated with its AFFF products of which the military was not already aware, [defendant] points to materials such as a November 2017 Department of Defense report to Congress, in which the agency acknowledged the [EPA]'s stated concerns with PFOS/PFOA in drinking water . . . .").

30.    At minimum, these facts constitute colorable evidence that Naval Sea Systems Command "made a discretionary determination" regarding the formulation of MilSpec AFFF after weighing the fire-suppression benefits against the alleged risks. *See Twinam v. Dow Chem. Co.* (*In re "Agent Orange" Prod. Liab. Litig.*), 517 F.3d 76, 90 (2d Cir. 2008); *see also Albrecht*, 2011 WL 5109532, at *5 ("A defendant is not required to warn the government where 'the government knew as much or more than the defendant contractor about the hazards of the product.'" (citation omitted)).  Where, as here, the government has exercised "discretionary authority over areas of significant federal interest such as military procurement," the government contractor defense applies. *In re "Agent Orange" Prod. Liab. Litig.*, 517 F.3d at 89–90; *see also Ayo*, 2018 WL 4781145, at *13.

31.    Tyco's use of PFAS in MilSpec AFFF was required by military specifications.  By seeking to impose tort liability on Tyco for alleged injuries to Plaintiff that were caused in whole

---

[14]    *See* MIL-PRF-24385F(SH), Amendment 4, § 6.6 & Tables I, III (2020), https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=17270; *see also* David Vergun, *DOD Officials Discuss Fire-Fighting Foam Replacement, Remediation Efforts* (Sept. 16, 2020), https://tinyurl.com/ty5ku8hp.

or in part by Tyco's compliance with military specifications, Plaintiff is attempting to use state tort law to attack design choices dictated by the military.  The government contractor defense precludes such an attack.  *See Boyle*, 487 U.S. at 509.

WHEREFORE, Tyco hereby removes this action from the Court of Common Pleas of Montgomery County, Pennsylvania, to this Court.

Dated:  January 12, 2022                    Respectfully submitted,

                                            HANGLEY ARONCHICK SEGAL PUDLIN
                                            & SCHILLER

                                            By:    */s/ Jason A. Levine*
                                                 Mark A. Aronchick, Pa I.D. 20261
                                                 Jason A. Levine, Pa. I.D. 306446
                                            One Logan Square, 27th Floor
                                            Philadelphia, PA 19103
                                            (215) 568-6200
                                            maronchick@hangley.com
                                            jlevine@hangley.com

                                            *Attorneys for Defendants Tyco Fire Products LP
                                            and Chemguard, Inc.*

# EXHIBIT A

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA**

THE BOROUGH OF AMBLER

vs.

3M COMPANY

NO. 2021-24289

## NOTICE TO DEFEND - CIVIL

You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after this complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.

YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW. THIS OFFICE CAN PROVIDE YOU WITH INFORMATION ABOUT HIRING A LAWYER.

IF YOU CANNOT AFFORD TO HIRE A LAWYER, THIS OFFICE MAY BE ABLE TO PROVIDE YOU WITH INFORMATION ABOUT AGENCIES THAT MAY OFFER LEGAL SERVICES TO ELIGIBLE PERSONS AT A REDUCED FEE OR NO FEE.

LAWYER REFERENCE SERVICE
MONTGOMERY BAR ASSOCATION
100 West Airy Street (REAR)
NORRISTOWN, PA 19404-0268

(610) 279-9660, EXTENSION 201

IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee =$290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

THE BOROUGH OF AMBLER

vs.

3M COMPANY

NO.  2021-24289

## CIVIL COVER SHEET

State Rule 205.5 requires this form be attached to any document <u>commencing an action</u> in the Montgomery County Court of Common Pleas.  The information provided herein is used solely as  an aid in tracking cases in the court system.  This form does not supplement or replace the filing and service of pleadings or other papers as required by law or rules of court.

Name of Plaintiff/Appellant's Attorney:   VIOLA VETTER, Esq., ID: 206277

Self-Represented (Pro Se) Litigant ☐

**Class Action Suit**          ☐ Yes      ☒ No

**MDJ Appeal**      ☐  Yes   ☒  No          <u>**Money Damages Requested**</u> ☐

<u>**Commencement of Action**</u>:          <u>**Amount in Controversy**</u>:

Complaint

## Case Type and Code

Tort: _____

Nuisance

**Other:**      _____

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**IN THE COURT OF COMMON PLEAS**
**MONTGOMERY COUNTY, PA**
**CIVIL DIVISION**

THE BOROUGH OF AMBLER
Ambler Borough Hall
131 Rosemary Avenue
Ambler, PA  19002,

                Plaintiff,

                v.                     CASE NO.: _____

3M COMPANY
3M Center
St. Paul, Minnesota 55144;             **JURY TRIAL DEMANDED**

BUCKEYE FIRE EQUIPMENT CO.
110 Kings Road
Kings Mountain, North Carolina 28086;

CARRIER GLOBAL CORP.
13995 Pasteur Boulevard
Palm Beach Gardens, Florida  33418;

KIDDE-FENWAL, INC.
One Financial Plaza
Hartford, Connecticut 06101;

KIDDE PLC, INC.
9 Farm Springs Road
Farmington, Connecticut 06032;

RAYTHEON TECHNOLOGIES CORP.
870 Winter Street
Waltham, MA 02451;

UTC FIRE & SECURITY AMERICAS CORP.,
INC.
13995 Pasteur Blvd.
Palm Beach Gardens, Florida 33418;

CHEMGUARD, INC.
One Stanton St.
Marinette, Wisconsin 54143;

i

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

NATIONAL FOAM, INC.
350 East Union Street
West Chester, Pennsylvania 19382;

TYCO FIRE PRODUCTS LP
One Stanton St.
Marinette, Wisconsin 54143;

AGC CHEMICALS AMERICAS, INC.
5 East Uwchlan Avenue, Suite 201
Exton, Pennsylvania 19341;

ARCHROMA U.S., INC.
5435 77 Center Dr, #10
Charlotte, NC 28217-0725;

ARKEMA, INC.
900 1st Avenue
King of Prussia, Pennsylvania 19406;

BASF CORP.
3000 Continental Drive North
Mt Olive, New Jersey 07828;

CHEMDESIGN PRODUCTS, INC.
2 Stanton St.
Marinette, Wisconsin, 54143-2543;

CHEMICALS INCORPORATED
12321 Hatcherville Road,
Baytown, Texas 77521;

THE CHEMOURS CO.
1007 Market Street
Wilmington, Delaware 19899;

THE CHEMOURS CO. FC, LLC,
1007 Market Street
Wilmington, Delaware 19899;

CLARIANT CORP.
4000 Monroe Road
Charlotte, North Carolina 28205;

CORTEVA, INC.
974 Centre Road

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Wilmington, Delaware 19805;

DUPONT DE NEMOURS, INC.
974 Centre Road
Wilmington, Delaware 19805;

E.I. DU PONT DE NEMOURS AND CO.
974 CEntre Road
Wilmington, Delaware 19805;

DEEPWATER CHEMICALS, INC.
196122 E County Road 735
Woodward, Oklahoma 73801;

DYNAX CORP.
103 Fairview Park Drive
Elmford, New York 10523;

and

DOES 1-100,

                            Defendants.

_____

**COMPLAINT**

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

# TABLE OF CONTENTS

I.      NATURE OF THE ACTION ..................................................................................1

II.     PARTIES ...........................................................................................................5

III.    JURISDICTION AND VENUE .......................................................................12

IV.     FACTUAL ALLEGATIONS ...........................................................................12

       A.      PFAS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND
           ENVIRONMENTAL HEALTH AND SAFETY. ...................................................12

       B.      THE PUBLIC'S UNDERSTANDING OF PFAS, A NATIONWIDE
           ENVIRONMENTAL PROBLEM, CONTINUES TO EVOLVE...........................18

       C.      DEFENDANTS' AFFF PRODUCTS HAVE FOR DECADES CONTAMINATED THE
           ENVIRONMENT WITH PFAS...................................................................20

       D.      THE DEFENDANTS KNEW ABOUT BUT CONCEALED THE DANGERS OF PFAS
           CONTAINED IN AFFF..........................................................................24

       E.      DEFENDANTS' AFFF PRODUCTS HAVE CAUSED (AND CONTINUE TO
           CAUSE) WIDESPREAD PFAS CONTAMINATION IN AND AROUND THE
           BOROUGH. .........................................................................................34

FIRST CAUSE OF ACTION .......................................................................................40

SECOND CAUSE OF ACTION ...................................................................................43

THIRD CAUSE OF ACTION ......................................................................................45

FOURTH CAUSE OF ACTION ...................................................................................48

FIFTH CAUSE OF ACTION .......................................................................................49

SIXTH CAUSE OF ACTION .......................................................................................49

PRAYER FOR RELIEF ..............................................................................................54

DEMAND FOR JURY TRIAL .....................................................................................55

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Plaintiff the Borough of Ambler ("Plaintiff," the "Borough," or "Ambler"), by and through its undersigned counsel, brings this action against defendants 3M Company, Buckeye Fire Equipment Co., Carrier Global Corp., Kidde-Fenwal, Inc. Kidde PLC, Inc., Raytheon Technologies Corp. (formerly known as United Technologies Corp.), UTC Fire & Security Americas Corp., Inc., Chemguard, Inc., National Foam, Inc., Tyco Fire Products LP, AGC Chemicals Americas, Inc., Archroma U.S., Inc., Arkema, Inc., BASF Corp., ChemDesign Products, Inc., Chemicals Incorporated, the Chemours Co., the Chemours Co. FC, LLC, Clariant Corp., Corteva, Inc., DuPont de Nemours, Inc., E.I. du Pont de Nemours and Co., Deepwater Chemicals, Inc., Dynax Corp., and Does 1-100 (collectively, "Defendants"), and alleges as follows:

## I.      NATURE OF THE ACTION

1.      This case centers on Defendants' conduct in designing, manufacturing, marketing, distributing, supplying, and/or selling aqueous film-forming foam ("AFFF") products, and certain chemical ingredients incorporated into those products, resulting in contamination and pollution of the natural resources located in and around the Borough with toxic per- and polyfluoroalkyl substances ("PFAS").

2.      The Borough provides drinking water to the residents of Ambler and surrounding communities, operates a municipal stormwater conveyance system pursuant to a National Pollutant Discharge Elimination System ("NPDES") permit, manages and operates municipal wastewater treatment works for the benefit of Ambler residents and those in surrounding communities, and has responsibility for maintaining the integrity and quality of the public natural resources within its jurisdiction, including groundwater, surface water, soil, air, and other public natural resources.

3.      The Borough and the Pennsylvania Department of Environmental Protection ("PA

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

DEP") have investigated the presence of PFAS contamination in the Borough's water supplies and other natural resources and properties under its ownership or management, and continue to conduct monitoring and analysis to protect such resources and to preserve the public health.

4.      The Borough's continuing investigation has demonstrated the presence of elevated concentrations of PFAS chemicals in Ambler's resources and properties, including but not limited to perfluorooctane sulfonic acid ("PFOS") and perfluorooctanoic acid ("PFOA").

5.      The Borough brings this action against Defendants to recover past, current, and future costs, losses, damages, and other relief relating to the actual or potential presence of toxic PFAS traceable to AFFF products in the Borough's waters and water systems—including stormwater systems, drinking water supplies and wastewater treatment works and public waters and natural resources under Borough ownership or management, or for which the Borough has a responsibility, under Pennsylvania law, to protect the integrity or quality of such waters and natural resources—and any lands, facilities, or properties under Borough ownership or management. Such costs, losses, and damages include those resulting from or associated with the investigation, assessment, monitoring, analysis, remediation, treatment, removal, disposal, or other past, current, or future action or response, including efforts to protect such public resources from future injury and to compensate for the loss of use of such resources, relating to the actual or potential presence of PFAS compounds in such resources and properties as a result of Defendants' conduct.

6.      PFOS, PFOA, and other PFAS compounds are all synthetic industrial compounds that are highly toxic to human and animal health, extremely persistent in the environment, soluble in water and fatty tissue, bioaccumulative, volatile or semivolatile, and difficult to remediate or remove from natural resources, water supplies, and other environmental media.

7.      Accordingly, PFAS contamination or pollution of public resources, natural

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

resources, water infrastructure, and other environmental media represents a public health threat that has and will result in significant costs, losses, and damages to the Borough and its residents.

8.      Defendants designed, manufactured, marketed, promoted, distributed, and/or sold, or acquired or assumed the liabilities of persons that designed, manufactured, marketed, promoted, distributed, and/or sold AFFF products based on PFAS chemistries or PFAS compounds, their precursors, and/or products containing PFAS compounds, for use in AFFF products.

9.      Defendants did so with knowledge that these dangerous chemicals would be released into the environment during the ordinary and intended use of their AFFF products, foreseeably causing harm to the Borough.

10.     By the late 1970s, 3M Company ("3M") had confirmed internally that PFOS and PFOA had been detected in human blood, *i.e.*, that the chemicals had spread far beyond the immediate site of their application, and were "more toxic than anticipated."  The company, however, withheld information concerning these chemicals' toxicity from the U.S. Environmental Protection Agency ("EPA") and other regulators for decades.  One of 3M's chief scientists eventually resigned over the company's failure to dedicate sufficient resources to the investigation of PFOS's harms, calling the chemical the "most onerous pollutant since PCB[.]"

11.     DuPont (defined below), which had worked closely with 3M on research concerning PFOS and PFOA since at least the 1970s, likewise recognized many decades ago that PFOA was toxic and needed to be handled with extreme care and likewise withheld this and other information from regulators and the public.

12.     On information and belief, the remaining Defendants also knew or, at a minimum, should have known about the toxicity and environmental hazards posed by the key chemical ingredients in their AFFF and/or AFFF component products, including through their participation

3

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

in industry trade groups formed for the purpose of lobbying regulators to protect their lucrative AFFF lines of business.

13.     Safer alternatives to AFFF not containing or breaking down into toxic PFAS were available when Defendants designed, manufactured, marketed, distributed, supplied, and/or sold the products that are the subject of this Complaint. Indeed, under regulatory pressure, several of the Defendants have altered the chemical make-up of their AFFF products to rely on fluorosurfactants that they claim are less biopersistent and less toxic. Defendants could have made such changes much sooner.

14.     Defendants also failed to provide adequate warnings and instructions with their AFFF products. Indeed, Defendants failed to advise adequately about (i) the harms their PFAS-based AFFF products posed to the environment and human health; (ii) methods of environmentally safe disposal of their AFFF products; and (iii) designs of AFFF release sites, including firefighting training sites, that would limit or potentially eliminate the release of PFAS into the environment or otherwise mitigate their environmental effects.

15.     On information and belief, Defendants' AFFF products and/or PFAS-based products used in the production of AFFF products have been used, stored, handled, released, and disposed of in the Borough and/or in the vicinity of the Borough's resources, including its drinking water supplies, wastewater treatment works, stormwater conveyance system, surface waterbodies, and other natural and public resources.

16.     As a result, Defendants caused contamination of the Borough's natural resources and properties. The Borough's natural resources and properties have been and continue to be contaminated by Defendants' PFAS-laced AFFF products and additional Borough natural resources and properties are under threat of future injury due to known PFAS contamination

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

upstream and/or upgradient from such resources and properties.

17.    At all times relevant to this action, the Borough neither knew nor should have known of the actual or potential contamination of its resources and properties with dangerous PFAS compounds resulting from the ordinary and intended use and disposal of Defendants' AFFF products.

18.    The Borough seeks to recover all damages available by law, including compensatory, consequential, and punitive damages; restitution; injunctive relief requiring Defendants to abate injured or impaired Borough resources and properties; and all other relief available under law.

19.    This action addresses only PFAS-related injuries attributable to the Defendants as a result of the design, manufacture, marketing, distribution, sale, use, and/or disposal of AFFF products and AFFF component products.  To the extent the Borough has suffered or may in the future suffer injuries relating to PFAS associated with a different application or other use of PFAS compounds, such claims are not included in this action, may be pursued in a separate action, and are expressly preserved.

## II.    PARTIES

20.    Plaintiff the Borough of Ambler is a municipal corporation, duly organized and existing by virtue of the laws of the Commonwealth of Pennsylvania.

21.    The Borough brings this action in its governmental capacity, including as trustee of public natural resources pursuant to Article I, Section 27 of the Pennsylvania Constitution and related law; pursuant to its police powers, including the powers to prevent and abate pollution of the Borough's natural resources, to prevent and abate nuisances, and to prevent and abate hazards to the public health, safety, and welfare, and to the environment; as owner, manager, and operator

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

of the Borough's drinking water, stormwater, wastewater, and other water systems; and by its authority under Section 6020.507 of the Pennsylvania Hazardous Sites Cleanup Act, 35 P.S. §§ 6020.101, *et seq.* ("HSCA").

22.     The Borough provides drinking water to approximately 20,000 persons in and around Ambler.  The Borough operates nine deep wells and one surface water supply facility to meet consumer demand for drinking water.

23.     The Borough manages and operates the Borough Wastewater Treatment Plant ("WTP") and treats wastewater from residents in the Borough, as well as the Townships of Upper Dublin, Lower Gwynedd, Whitemarsh, and Whitpain.  The WTP discharges to the Wissahickon Creek.

24.     The Borough is subject to a discharge permit issued by PA DEP pursuant to the National Pollutant Discharge Elimination System (NPDES, as defined above) under the Clean Water Act with respect to its discharges from the WTP.

25.     To discharge stormwater from its municipal separate storm sewer system ("MS4"), the Borough is subject to a Municipal Separate Storm Sewer NPDES Permit issued by PA DEP.

26.     The Borough's MS4 system has approximately 34 outfalls and discharges into the Wissahickon Creek and its tributaries.  Among other legal obligations imposed by the MS4 NPDES permit, the Borough is responsible for reducing, to the maximum extent practicable, discharge of pollutants through its stormwater system.

27.     The Borough will likely be required in the future to retrofit or upgrade its water infrastructure, including drinking water, wastewater treatment, and MS4 systems, in order to manage, remove, control, and reduce the presence of PFAS attributable to Defendants' misconduct in the Borough's resources and properties and in resources and properties of other jurisdictions.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

28.    The Borough will also need to continue monitoring, assessing, investigating, and otherwise responding to PFAS contamination in its water infrastructure and resources, including drinking water systems, wastewater treatment works, and stormwater MS4 systems, as well as waterways, surface waters and drinking water supplies, to protect public health.  The Borough anticipates that remediation and removal activities targeting PFAS contamination in its water infrastructure and resources will be required under federal and/or state law.

29.    Defendant 3M Company (3M, as defined above) is a Delaware corporation with its principal place of business in St. Paul, Minnesota.  3M designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS, including PFOS, PFOA, and PFHxS.  Upon information and belief, these 3M products were used and discharged into the environment in and around the Borough.

30.    Defendant Buckeye Fire Equipment Co. ("Buckeye") is an Ohio corporation with its principal place of business in Mountain, North Carolina.  Buckeye designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the Borough.

31.    Defendant Carrier Global Corp. ("Carrier") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.

32.    Defendant Kidde-Fenwal, Inc. is a Delaware corporation with its principal place of business in Hartford, Connecticut.

33.    Defendant Kidde PLC, Inc. is a Delaware corporation with its principal place of business in Farmington, Connecticut.

34.    Defendant Raytheon Technologies Corp. ("Raytheon") is a Delaware corporation

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

with its principal place of business in Farmington, Connecticut.  Raytheon was formerly known as United Technologies Corp.

35.     Defendant UTC Fire & Security Americas Corp., Inc. ("UTC") is a Delaware corporation with its principal place of business in Palm Beach Gardens, Florida.  UTC is a successor-in-interest to United Technologies Corp.

36.     Defendants Carrier, Kidde-Fenwal, Inc., Kidde PLC, Inc., Raytheon, and UTC are referred to herein as the "Kidde Defendants."  The Kidde Defendants designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the Borough.

37.     Defendant Chemguard, Inc. ("Chemguard") is a Texas corporation with its principal place of business in Marinette, Wisconsin.  Chemguard designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these Chemguard products were used and discharged into the environment in and around the Borough

38.     Defendant National Foam, Inc. ("National Foam") is a Delaware corporation with its principal place of business in Angier, North Carolina.  National Foam is a subsidiary of Angus International Safety Group, Ltd.  National Foam designed, manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these AFFF products were used and released into the environment in and around the Borough.

39.     Defendant Tyco Fire Products LP ("Tyco") is a Delaware limited partnership with its principal place of business in Lansdale, Pennsylvania.  Tyco is the parent corporation to Chemguard and successor-in-interest to the Ansul Company ("Ansul").   Tyco designed,

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

manufactured, marketed, sold, and/or distributed AFFF products containing or breaking down into PFAS.  Upon information and belief, these Tyco products were used and discharged into the environment in and around the Borough.

40.    Defendant AGC Chemicals Americas, Inc. ("AGC") is a Delaware corporation with its principal place of business in Exton, Pennsylvania.  Upon information and belief, AGC's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

41.    Defendant Archroma U.S., Inc. ("Archroma") is a Delaware corporation with its principal place of business in Charlotte, North Carolina.  Upon information and belief, Archroma's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

42.    Defendant Arkema, Inc. ("Arkema") is a Pennsylvania corporation with its principal place of business in King of Prussia, Pennsylvania.  On information and belief, Arkema was formerly known as Atochem, Inc. and/or is the successor-in-interest to Atochem, Inc.  On information and belief, fluorosurfactants manufactured by Arkema and/or Atochem, Inc. were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

43.    Defendant BASF Corp. ("BASF") is a Delaware corporation with its principal place of business in Florham Park, New Jersey.  BASF is a successor-in-interest to Ciba-Geigy Corp. Upon information and belief, fluorosurfactants manufactured by BASF and/or Ciba-Geigy Corporation or Ciba Specialty Chemicals, including those trademarked Lodyne™, were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

44.    Defendant ChemDesign Products, Inc. ("ChemDesign") is a Texas corporation

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

with its principal place of business in Marinette, Wisconsin.  Upon information and belief, fluorosurfactants manufactured by ChemDesign were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

45.     Defendant Chemicals Incorporation ("Chem Inc.") is a Texas corporation with its principal place of business in Baytown, Texas.  Upon information and belief, fluorosurfactants manufactured by Chem Inc. were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

46.     Defendant the Chemours Co. is a Delaware corporation with its principal place of business in Wilmington, Delaware.  Chemours Co. was previously a subsidiary of Old DuPont (as defined below) and was spun out of Old DuPont into an independent, publicly traded company on July 1, 2015.

47.     Defendant the Chemours Co. FC, LLC is a Delaware LLC with its principal place of business in Wilmington, Delaware.  Chemours Co. FC, LLC is a wholly-owned subsidiary of Chemours Co.

48.     Defendants the Chemours Co. and the Chemours Co. FC, LLC are jointly referred to herein as "Chemours."  Chemours designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in the manufacture of AFFF.  Upon information and belief, Chemours's fluorosurfactants, including those trademarked Capstone™, were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

49.     Defendant Clariant Corp. ("Clariant") is a New York corporation with its principal place of business in Charlotte, North Carolina.  Upon information and belief, Clariant's fluorosurfactants were used to manufacture AFFF that was used and discharged into the

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

environment in and around the Borough.

50.     Defendant Corteva, Inc. is a Delaware corporation with its principal place of business in Wilmington, Delaware.

51.     Defendant DuPont de Nemours, Inc. ("New DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware.

52.     Defendant E.I. du Pont de Nemours and Co. ("Old DuPont") is a Delaware corporation with its headquarters and principal place of business in Wilmington, Delaware.

53.     New DuPont, Old DuPont, and Corteva, Inc. are referred to collectively as "DuPont." For decades, DuPont manufactured products containing PFAS, including PFOA, which DuPont obtained from 3M.  In the early 2000s, after 3M had ceased the manufacture of PFOS and PFOA, DuPont itself began to manufacture PFOA.  DuPont designed, manufactured, marketed, sold, and/or distributed fluorosurfactants containing or breaking down into PFAS for use in the manufacture of AFFF.  Upon information and belief, DuPont's fluorosurfactants, including those trademarked Capstone™, were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

54.     Defendant Deepwater Chemicals, Inc. ("Deepwater") is a Delaware corporation with its principal place of business in Woodward, Oklahoma.  Upon information and belief, fluorosurfactants manufactured by Deepwater were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

55.     Defendant Dynax Corp. ("Dynax") is a Delaware corporation with its principal place of business in Elmsford, New York.  Upon information and belief, Dynax's fluorosurfactants were used to manufacture AFFF that was used and discharged into the environment in and around the Borough.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

56.     On information and belief, Does 1-100 were designers, manufacturers, marketers, distributors, and/or sellers of AFFF products that have and continue to contaminate Borough resources and properties.  Although the identities of these Doe defendants are currently unknown, it is expected that their names will be ascertained during discovery, at which time the Borough will move for leave to add those persons as defendants in this litigation.

## III.     JURISDICTION AND VENUE

57.     This Court has jurisdiction over this action pursuant to 42 Pa. C.S.A. § 931.

58.     This Court has jurisdiction over Defendants in this action pursuant to 42 Pa. C.S.A. § 5322 because Defendants have, among other things, conducted business in this Commonwealth and caused tortious injury in this Commonwealth.

59.     Further, jurisdiction and venue are appropriate in this judicial district because all of the natural resources and/or property that are the subject of the action are situated in this judicial district.  No federal subject-matter jurisdiction exists or is invoked herein.

## IV.     FACTUAL ALLEGATIONS

### A.     PFAS ARE DANGEROUS CHEMICALS THAT THREATEN HUMAN AND ENVIRONMENTAL HEALTH AND SAFETY.

60.     Per- and polyfluoroalkyl substances (PFAS, as defined above) are a group of synthetic chemical compounds containing fluorine and carbon atoms.  They are known as "surfactants" in that they reduce the surface tension of water.  As such, these chemicals have been used for decades in the manufacture of household and commercial products that resist heat, stains, oil, and water, including carpet and clothing treatments, cardboard packaging and leather products, emulsifiers, wetting agents, additives and coatings, processing aids in the manufacture of fluoropolymers such as nonstick coatings on cookware, and membranes for clothing that are both waterproof and breathable.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

61.     PFAS are man-made; they do not occur naturally.

62.     The two most widely studied types of PFAS are PFOA and PFOS, both synthetic, fully fluorinated organic acids with eight carbon atoms.

63.     Although PFOS and PFOA are the most widely studied types of PFAS, the PFAS family includes thousands of different chemicals.  Defendants have incorporated dozens of different PFAS chemicals in their AFFF product formulations, including PFOA, PFOS, and PFHxS, among others.

64.     PFAS compounds have a number of unique properties that, together, turn these chemicals into a grave threat to public health and the environment.

65.     ***PFAS chemicals are mobile and persistent***.  They readily spread into the natural environment upon release, where they break down very slowly, if at all.

66.     The compounds are characterized by multiple carbon-fluorine bonds, which are exceptionally strong and stable.  As such, they are extremely persistent in the environment and resistant to metabolic and environmental degradation.

67.     PFAS compounds easily dissolve in water and are thus highly mobile and readily spread in the environment.  They contaminate soils and leach from the soil into groundwater, where they can travel significant distances underground.

68.     PFAS compounds are also volatile or semivolatile.  Small amounts of the chemicals are routinely and uncontrollably released in the vapor phase from PFAS-containing products and PFAS-contaminated sites and waterbodies, and travel with air currents in vapor form.  When such vapors re-suspend or condense, the chemicals are deposited in new locations and environmental media, including surface waters, soils, and others.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

69. Through both water and air, therefore, PFAS contamination is aggressively mobile and difficult to control.

70. ***PFAS chemicals bioaccumulate and biomagnify*** in the environment. Bioaccumulation occurs when an organism absorbs a substance at a rate faster than that at which the substance is lost by catabolism and excretion. Biomagnification is the increasing concentration of a substance in the tissues of tolerant organisms at successively higher levels in a food chain.

71. PFAS chemicals are extremely stable and persistent and as such, once ingested, tend to bioaccumulate in individual organisms for a significant period of time.

72. For example, PFOS, PFOA, and PFHxS, among other PFAS, have been shown to accumulate to levels of concern in fish, reaching concentrations of several thousands of times higher than in water. The compounds have been detected in both wild-caught and farmed fish, presumably as a result of bioaccumulation and/or trophic transfer, i.e., biomagnification up the food chain.

73. PFOA, PFOS, and PFHxS, among other PFAS, have also been shown to bioaccumulate in air-breathing species, including humans.

74. PFAS chemicals further bioaccumulate in the unborn and in infants by crossing the placenta from mother to fetus and by passing to infants through breast milk.

75. PFAS chemicals biomagnify up the food chain—for example, when humans eat fish that have ingested the substances. PFOS has been observed in high concentrations in various animals higher up in the food chain, including bald eagles, walrus, narwhals, and beluga whales.

76. Finally and critically, ***PFAS chemicals are toxic***. Numerous studies make plain that exposure to or ingestion of these chemicals can pose serious risks to humans and to animals.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, by the The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

77.     All PFAS exhibit one or more of the "key characteristics of carcinogenicity." According to a March 2020 peer-reviewed study examining the properties of 26 PFAS compounds, including PFOA, PFOS, and PFHxS, all compounds studied demonstrated one or more of the key characteristics of carcinogens, such as inducing oxidative stress, immunosuppression, inducing epigenetic alterations, influencing cell proliferation, and modulating receptor-mediated effects.

78.     Human epidemiological studies, relied upon by the EPA for purposes of the agency's health advisories on PFOA, have found associations between PFOA exposure and high cholesterol, increased liver enzymes, decreased vaccination response, thyroid disorders, pregnancy-induced hypertension and preeclampsia, and testicular and kidney cancer.

79.     Recent research conducted by the National Toxicology Program ("NTP"), a division of the National Institute for Environmental Health Sciences ("NIEHS"), has also linked exposure to extremely small amounts of PFOA to pancreatic cancer.

80.     Alarmingly, when discussing the research at a conference on PFAS in June 2019, the director of NIEHS and NTP, Dr. Linda Birnbaum, told attendees that pancreatic tumors are present at "very, very low concentrations from PFOA." Dr. Birnbaum recommended that, to protect human health, the maximum concentration of PFOA should be 0.1 parts per trillion, or 700 times lower than the current EPA health advisory level of 70 ppt in drinking water.

81.     Human epidemiological studies, relied upon by the EPA for purposes of the agency's health advisories on PFOS, found associations between PFOS exposure and high cholesterol, thyroid disease, and adverse reproductive and developmental effects, including gestational diabetes, preeclampsia, and low birth weight. The developing fetus and newborns are particularly sensitive to PFOS-induced toxicity.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

82.     PFOS and PFOA are toxic to laboratory animals, producing reproductive, developmental and systemic effects in laboratory tests.

83.     The World Health Organization's International Agency for Research on Cancer has found that PFOA is possibly carcinogenic to humans.

84.     The EPA has found that there is suggestive evidence that PFOS and PFOA may cause cancer in humans.

85.     A March 2020 peer-reviewed study applied ten key characteristics of carcinogens to 26 PFAS compounds, including PFOA, PFOS, and PFHxS.  The "key characteristics of carcinogens" framework is used for cancer hazard identification.

86.     That study found "strong evidence" that multiple PFAS induce oxidative stress, are immunosuppressive, and modulate receptor-mediated effects.  The study found "suggestive evidence" that some PFAS can induce epigenetic alterations and influence cell proliferation.

87.     In particular, the study identified evidence that: (a) PFOA induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation; (b) PFOS induces epigenetic alterations; induces oxidative stress; induces chronic inflammation; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation; and (c) PFHxS induces oxidative stress; is immunosuppressive; modulates receptor-mediated effects; and alters cell proliferation.

88.     Similar traits associated with carcinogenicity were identified with respect to other PFAS compounds utilized in AFFF products designed, manufactured, marketed, distributed, provided, supplied and sold by Defendants.

89.     Another peer-reviewed study published in 2020 found further evidence that certain PFAS compounds, particularly PFOS and PFOA, result in premature births, decreased fertility,

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and increased odds of low birth weight. These adverse effects on reproductive health were demonstrated by an analysis of birth outcomes in Oakdale, Minnesota, where a portion of the population faced elevated exposure to PFAS due to long-term contamination of drinking water supplies from industrial waste disposal. The study focused on birth outcomes in the area from 2002 to 2011. Reproductive outcomes improved significantly following the installation of a water filtration facility in Oakdale at the end of 2006, demonstrating the causal relationship between exposure to high level of PFAS in drinking water and reproductive health.

90.     In October 2021, EPA also released a final human health toxicity assessment for GenX chemicals, which incorporated new data available since 2018. GenX chemicals, as explained further below, were a trademarked family of short-chain PFAS chemicals marketed since the 2010s by DuPont as a purportedly safer alternative to PFOA. The EPA's assessment resulted in a lower, more protective toxicity value for GenX chemicals relative to EPA's 2018 draft toxicity assessment.

91.     On November 16, 2021, EPA further provided the Science Advisory Board PFAS Review Panel with recent scientific data and new analyses that indicate negative health effects may occur at much lower levels of exposure to PFOA and PFOS than had previously been understood, and that PFOA is a likely carcinogen. These EPA analyses are now undergoing peer review, following which they will be used to inform health advisories and the development of Maximum Contaminant Level Goals and a National Primary Drinking Water Regulation for PFOA and PFOS.

92.     In addition, PFAS compounds have been shown to affect growth, learning, and behavior of infants and older children, decrease women's ability to become pregnant, and interfere with the body's natural hormones.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

**B.     THE PUBLIC'S UNDERSTANDING OF PFAS, A NATIONWIDE ENVIRONMENTAL PROBLEM, CONTINUES TO EVOLVE.**

93.     Given their physical and chemical properties, PFAS chemicals have become incredibly widespread in the environment, contaminating drinking water supplies, water infrastructure (including stormwater systems, water treatment plants, and drinking water delivery infrastructure), and posing an environmental and human health crisis in the Borough and beyond.

94.     Indeed, PFAS have been detected in environmental media and biota in many parts of the world, including oceans and the Arctic.

95.     The chemicals have been found in cereals, fish, soft drinks, milk, olive oil, and meat, as well as in prepared foods.

96.     According to the EPA, between 1999 and 2012, PFOA and PFOS have been detected in the blood serum of 99% of the U.S. population.  This is particularly troubling given the real and significant adverse health effects these chemicals pose.

97.     The Director of the U.S. Center for Disease Control's National Center for Environmental Health, Patrick Breysse, described the chemicals in October of 2017 as "one of the most seminal public health challenges for the next decades" and estimated 10 million Americans were drinking contaminated water.  Current research estimates that this number is significantly higher—likely in the hundreds of millions of Americans.

98.     This understanding of PFAS contamination as a widespread public health crisis has been slow to evolve, however, and has only fairly recently garnered broad attention.  Indeed, although the EPA began to investigate the safety of PFOA and PFOS in or around 1998 following some limited disclosures by 3M and others, the agency did not begin to issue health advisories for these chemicals until January 8, 2009.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM. Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

99.     The 2009 EPA health advisory noted merely that "action should be taken to reduce exposure" to drinking water containing levels of PFOA and PFOS exceeding 400 parts per trillion ("ppt") and 200 ppt, respectively.

100.     In May 2016, the EPA significantly revised its PFOA and PFOS health advisory, recommending that drinking water concentrations for PFOA and PFOS, either singly or combined, should not exceed 70 ppt.

101.     Notably, the EPA's health advisories are "informal technical guidance to assist federal, state and local officials, as well as managers of public or community water systems in protecting public health. They are not regulations and should not be construed as legally enforceable federal standards."

102.     EPA is poised to strictly regulate PFAS in the near future.  As of February 2020, EPA announced its intention to regulate PFOA and PFOS as "hazardous substances" under federal environmental laws, such as CERCLA.

103.     As of November 2020, EPA announced its intention to address PFAS in NPDES permits issued by EPA.

104.     On February 22, 2021, EPA finalized its decision to regulate levels of PFOS and PFOA in drinking water under the Safe Drinking Water Act (SDWA), including by proposing enforceable drinking water quality standards, known as Maximum Contaminant Levels ("MCLs)".

105.     On September 8, 2021, EPA announced that it was initiating three new rulemakings to reduce PFAS contamination by way of wastewater discharges from several key industries.

106.     Pennsylvania regulators are likewise proceeding to strictly regulate PFAS, particularly PFOA and PFOS.  In September of 2021, the PA DEP's Bureau of Safe Drinking Water proposed to establish MCLs for PFOA of 14 ppt and for PFOS of 18 ppt.  The

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Environmental Quality Board approved this plan on November 16, 2021. Pennsylvania legislators are recommending the creation of interim MCLs for PFOA and PFOS until PA DEP completes its MCL process.

107.    In November 2021, PA DEP further announced the release and anticipated approval and implementation of its new standards for PFAS contamination in soil. The Medium Specific Concentrations (MSC) for PFOA and PFOS in soil (rather than air or water) is a combined total of 4.4 mg/kg (residential) and 64 mg/kg (non-residential), with remediation required above those levels.

**C.    DEFENDANTS' AFFF PRODUCTS HAVE FOR DECADES CONTAMINATED THE ENVIRONMENT WITH PFAS.**

108.    The PFAS application critical to the claims asserted in this Complaint is AFFF, which is widely used to suppress and extinguish fires of flammable liquids, such as fuel and oil.

109.    In the 1940s, 3M began to experiment with a process called electrochemical fluorination to create the carbon-fluorine bonds that are they key components of PFAS, including PFOA, PFOS, and PFHxS.

110.    The other major carbon-fluorine bond producing process, which was used by the remaining Defendants, is called telomerization. This process generally results in PFOA and other carboxylates.

111.    Beginning in the 1950s through 2000, 3M sold PFOA to DuPont for use in DuPont's manufacturing operations. After 3M ceased production beginning in or around 2000, DuPont began producing PFOA.

112.    Recognizing the compounds' strong surfactant properties described above and building on its earlier experiments, 3M began to develop AFFF containing PFOS in the early 1960s to suppress flammable liquid fires that cannot be effectively extinguished with water alone.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

113.    In the late 1960s, the United States military issued military specification MIL-F-24385 governing the requirements for AFFF ("AFFF Mil Spec").  It required that the AFFF concentrate "consist of fluorocarbon surfactants plus other compounds . . ."  The AFFF Mil Spec, however, contains no further requirements concerning these fluorocarbons surfactants, such as the length of the fluorine-carbon chain.  The AFFF Mil Spec also states that "[t]he material shall have no adverse effect on the health of personnel when used for its intended purpose."  The current version of the AFFF Mil Spec still contains that language.

114.    The United States government has expressly clarified that the AFFF Mil Spec "was a *performance* military specification (as opposed to a *detail* military specification); meaning that the product manufacturers [and not the United States government] determine[d] the exact formulation and specific perfluorocarbon surfactants . . ."

115.    From the 1960s to about 1973, 3M was the sole supplier of AFFFs.  Beginning in 1973, fluorotelomer-based AFFF manufacturers entered the market.

116.    AFFF is applied by firefighters in the field by mixing foam concentrate and water to make a foam solution. When applied to a fire, the foam solution is aerated at the nozzle.  The foam solution is sprayed out to coat the fire, blocking the supply of oxygen feeding the fire and creating a cooling effect and evaporation barrier.  A film also forms to smother the fire after the foam has dissipated:

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.



117.   In other words, it is intended by, and foreseeable to, the AFFF manufacturer or supplier that AFFF will be mixed with water and sprayed in such a manner that it can freely seep into the groundwater and soil, contaminating the environment.

118.   PFAS-based AFFF is the predominant commercial PFAS application that, when used as intended, releases these toxic chemicals directly into the environment in a manner enabling them to freely seep into the groundwater, contaminate drinking water supplies, and travel long distances to cause further, widespread environmental contamination.

119.   A single firefighting event or training exercise may result in the release of thousands of gallons of foam solution laced with PFAS that then enter and contaminate the environment.

120.   For decades, PFAS-based AFFF products have been stored and used for fire suppression, fire training, and flammable vapor suppression at hundreds of locations, such as fire training schools, military installations, and civilian airports, as well as at petroleum refineries,

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

storage facilities, and chemical manufacturing plants throughout the United States, including in the Borough.

121.     Additionally, local fire departments have used and maintained quantities of AFFF in their inventories.

122.     Fire training exercises involving AFFF are common, particularly on airfields, fire training schools, and military installations, and have been performed many thousands of times since the 1960s, each time releasing vast quantities of toxic chemicals into the environment.

123.     AFFF use has been identified as one of the main contributors to the widespread environmental contamination with PFAS.

124.     Despite the recent phase-out of certain long-chain PFAS, further discussed below, much of the current AFFF stockpiles still contain long-chain PFAS constituents due to the long shelf-life of these products.  PFAS-based AFFF thus continues to be widely stored and used, including in or around the Borough.

125.     Significantly, in recognition of the dangers of PFAS, the AFFF Mil Spec was amended in September 2017 to state expressly that the Department of Defense seeks "to acquire and use a non-fluorinated AFFF formulation or equivalent firefighting agent to meet [its] performance requirements …." and again in April 2020 to make clear that the AFFF Mil Spec requires only that AFFF "[c]oncentrates shall consist of surfactants plus other compounds…" – not necessarily fluorosurfactants.

126.     Had Defendants been forthright about their products' chemical properties and the environmental and human health hazards they posed, the Department of Defense (and federal and state regulatory agencies) would have taken steps to prevent, control, or minimize the environmental and human health threats from AFFF containing and/or breaking down into PFAS,

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

including PFOA, PFOS, and PFHxS, much sooner, or would never have used them in the first place.

### D.   THE DEFENDANTS KNEW ABOUT BUT CONCEALED THE DANGERS OF PFAS CONTAINED IN AFFF.

127.   Particularly 3M and DuPont have known or, at a minimum, should have known for many decades that PFOA, PFOS, and other PFAS compounds are mobile and persistent, bioaccumulative and biomagnifying, volatile, and above all toxic.

128.   Upon information and belief, the other Defendants, each of which designed, manufactured, marketed, provided, supplied, sold, and/or distributed PFAS-based AFFF and/or AFFF component products, likewise knew of the dangers posed by PFAS, including through information they obtained as part of their participation in trade industry associations.

129.   All Defendants were careful to withhold the most damning information about PFOS, PFOA, and other PFAS from the public and regulators.

130.   3M conducted extensive toxicity studies on PFAS, including PFOS and PFOA, as early as the 1950s, concluding that the chemicals were toxic.

131.   Further toxicity studies conducted by 3M scientists in the late 1970s confirmed that the chemicals were even "more toxic than anticipated."

132.   In 1978, 3M conducted studies on monkeys and rats, feeding them various dosages of PFOS and PFOA. All monkeys in the study died within the first few days after being given PFOS at a dosage of 4.5 mg/kg/day. Monkeys being given 100 mg/kg/day of PFOA "all died during weeks 2 and 5 of the study." The companies' studies showed that both PFOA and PFOS affected the liver and gastrointestinal tract of the species tested.

133.   3M concluded that PFOS was "the most toxic" of the compounds studied and "certainly more toxic than anticipated."

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

134.    3M consulted with Harold Hodge, a well-known toxicologist, who emphasized that it was of "utmost importance" to determine whether these chemicals "or its metabolites are present in man, what level they are present, and the degree of persistence (half-life) of these materials."

135.    Further, in 1975, 3M was alerted by third-party researchers that PFOS was detectable in human blood serum and thus had obviously spread beyond the immediate site of its applications and was bioaccumulating.  3M's own research confirmed by the next year that the level of fluorochemicals in the blood of its own workers was "1,000 times normal."

136.    Conducting research around its manufacturing plants, 3M knew by 1979 that its fluorochemicals "bioaccumulated more readily in the gastrointestinal tract, fat and reproductive system [at least in] channel catfish[.]"

137.    By 1979, 3M recognized that fluorochemicals may pose a cancer risk.  Indeed, one of its scientists pressed that it was "paramount to begin now an assessment of the potential (if any) of long term (carcinogenic) effects for these compounds which are known to persist for a long time in the body and thereby give long term chronic exposure."

138.    3M never published its toxicity studies and worked actively to stifle research on the adverse effects of PFAS, including PFOA and PFOS.  Indeed, 3M kept John Giesy, Ph.D., Professor and Canada Research Chair in Environmental Toxicology in the Department of Veterinary Biomedical Sciences and Toxicology Centre at the University of Saskatchewan, on its payroll to the tune of millions of dollars for the purpose of influencing independent academic research.  It was Prof. Giesy's professed goal to keep unfavorable papers regarding PFAS out of the academic literature, lest plaintiffs find scientific support for legal theories seeking to hold 3M liable for injuries.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

139.   3M also advised its employees not to put their thoughts and research concerning PFOS or PFOA to writing, as such communications would need to be disclosed during discovery in likely litigation.

140.   3M also knew full well the environmental implications associated with PFAS compounds, including PFOS and PFOA, but refused to allow testing to perform precise ecological risk assessments.   One of its longtime scientists, Dr. Richard Purdy, stated in an internal email: "PFOS is the most onerous pollutant since PCB and you want to avoid collecting data that indicates that it is probably worse.  I am outrage[d.]"

141.   Despite 3M's knowledge of PFAS toxicity and potential carcinogenicity, the mobility and persistence in the environment of such chemicals, and their tendency to bioaccumulate and biomagnify, the company continued to manufacture, sell, and distribute PFAS-based AFFF until at least 2000.

142.   Dr. Purdy resigned, exhausted by the company's "roadblocks, delays, and indecision" concerning research on PFAS' environmental effects and failure to address their known environmental harms:

- 3M continues to make and sell these chemicals, though the company knows of an ecological risk assessment I did that indicates there is a better than 100% probability that perfluorooctansulfonate is biomagnifying in the food chain and harming sea mammals.  This chemical is more stable than many rocks.  And the chemicals the company is considering for replacement are just as stable and biologically available.  The risk assessment I performed was simple, and not worst case.  If worst case is used, the probability of harm exceeds 100,000%.

Dr. Purdy concluded that he could no longer work for a company "concerned with markets, legal defensibility and image over environmental safety."

143.   Dr. Purdy copied the EPA on his March 1999 resignation letter.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

144.    Shortly thereafter, 3M supplemented its prior submissions to the EPA with critical information referenced by Dr. Purdy.  In 2000, 3M "voluntarily" ceased production of certain PFAS compounds, including PFOS and PFOA.

145.    In April 2006, 3M paid a penalty of more than $1.5 million to the EPA for its failure to disclose pertinent studies regarding PFOA and PFOS.

146.    Much like 3M, DuPont has been aware of the toxicity of PFAS, including PFOA, for decades.

147.    By 1961, DuPont's own researchers had concluded that PFOA was toxic and should be "handled with extreme care."  During the 1960s, DuPont also had knowledge that PFOA caused adverse liver reactions in dogs and rats.

148.    By 1976, DuPont was also aware of research reports that detected organic fluorine in blood bank samples in the U.S., which the researchers believed to be a potential result of human exposure to PFOA.  In other words, DuPont knew or should have known that PFOA was traveling in the environment and bioaccumulating in other organisms.

149.    By 1982, DuPont's corporate medical director, Bruce Karrh, in internal correspondence confirmed that PFOA stays in the blood for a long time and registered his concern that members of the local community may be affected by PFOA releases.  DuPont then began a clandestine water sampling program to determine how far a distance from its operations PFOA remained in the waterways at elevated levels.  DuPont detected PFOA in water supplies at a distance of at least 79 miles from its Parkersburg plant.

150.    In 1979, DuPont further became aware of the PFOA/PFOS toxicity studies 3M had conducted on monkeys and rats described above.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

151.    About three years later, 3M also shared a study undertaken on pregnant rats, indicating that PFOA led to adverse effects in the unborn.  DuPont tested the blood of female workers who had given birth and had been exposed to PFOA, documenting that PFOA moved across the human placenta.

152.    DuPont transferred all women out of work assignments with potential exposure to PFOA, but concealed its pregnancy-related study from the EPA and public.

153.    During the mid-1980s, DuPont continued to find evidence of toxicity of PFOA. In 1985 and 1986, researchers from DuPont's Haskell Laboratory for Toxicology and Industrial Medicine published two studies on the toxicity of PFOA.  One study found PFOA to be "moderately toxic," producing "an increase in liver size and corneal capacity" in rats exposed by inhalation to PFOA; the other studied dermal toxicity in rats and rabbits and found skin irritation in both, and increased liver size in rats.

154.    By 1988, DuPont was aware that at least one toxicity study performed on laboratory rats revealed a relationship between PFOA exposure and increased rates of certain types of cancer, including testicular cancer.

155.    In 1988, DuPont internally classified PFOA as a possible human carcinogen.

156.    Evidence of PFOA's toxic effects continued to mount.  In 1999, DuPont received data from a laboratory study on the effects of PFOA exposure on primates that showed that two of twenty-two monkeys had died, including one that had received the lowest dose of PFOA.  And, by June 2000, DuPont was aware that the American Council of Governmental and Industrial Hygienists had designated PFOA as a "confirmed animal carcinogen."

157.    Despite its knowledge of PFOA's toxicity and carcinogenicity, its mobility and persistence in the environment, and its tendency to bioaccumulate, however, DuPont continued to

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

use PFOA in its products (and, beginning in 2002, also manufactured the chemical once its primary source, 3M, had exited that market), including surfactants made for use in the manufacture of AFFF.

158.    Having doubled down on the PFAS business, DuPont continued to actively conceal the risks of PFOA and other PFAS from the public.  Beginning in 2003, DuPont paid various consultants, including The Weinberg Group, thousands of dollars to implement a comprehensive strategy to attack and discredit those who alleged adverse health effects from PFOA, to prevent third parties from connecting DuPont to PFOA health problems, to coordinate media and third-party communications, and to thwart any PFOA-related litigation.

159.    In February 2003, a manager at DuPont's Parkersburg plant made knowingly false and misleading statements to the media, that: "[i]n more than 50 years of [PFOA] use by [DuPont] and others, there have been no known adverse human health effects associated with the chemical," that "all" of the available scientific research "has been provided to both state and federal regulators," that "epidemiological studies of workers do not indicate an increased risk of cancer associated with exposure to [PFOA]," that "[DuPont] has made significant efforts to respond to the public honestly and openly with correct information about [PFOA]," and that "the use of [PFOA] at the Washington Works site has not posed a risk to either human health or the environment."

160.    Later, in March and April of 2003, various DuPont employees and executives — including its Vice President and General Manager of Fluoroproducts, the Director of its Haskell Laboratory, its spokesperson for the Plant, and its CEO — made public statements denying that DuPont had seen any negative impacts on human health or the environment caused by DuPont's use of PFOA.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

161.   DuPont made multiple, additional knowingly false and misleading public statements regarding the toxicity and adverse health effects of PFOA and other PFAS.

162.   DuPont settled the Parkersburg resident litigation in 2005, as part of which settlement DuPont would financially support what was dubbed the "C8 Science Panel," made up of three independent epidemiologists from Emory University, Brown University, and the London School of Hygiene and Tropical Medicine, and tasked with researching the health effects of PFOA based on blood samples and other health data taken from almost 70,000 residents of the mid-Ohio Valley.

163.   Also in 2005, the EPA fined DuPont $16.5 million, then the largest civil administrative penalty the agency had ever issued, for the company's failure to report possible health risks associated with PFOA.

164.   With the writing on the wall and upon invitation by the EPA, DuPont agreed in 2006 to join the "PFOA Stewardship Program" working towards the elimination of PFOA by 2015.

165.   In the meantime, however, the company continued to manufacture PFOA, and at least until 2008 the company made fluorotelomers with PFOA byproducts for the express and intended purpose of being used in the manufacture of AFFF.

166.   The C8 Science Panel completed its research in 2013, finding likely connections between PFOA and high cholesterol, ulcerative colitis, pregnancy-induced hypertension, thyroid disease, testicular cancer, and kidney cancer.

167.   Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

168.    GenX is the trade name for the short-chain PFAS chemicals, including hexafluoropropylene oxide dimer acid, that allow for the creation of fluoropolymers without PFOA.

169.    DuPont first began generating GenX in or around 1980, but it remained a chemical byproduct of other manufacturing processes until the 2010s.

170.    While DuPont, in a 2010 marketing brochure, touted GenX as having "a favorable toxicological profile," studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure.  Indeed, as discussed above, based on continuing human health effects assessment research for GenX chemicals since 2018, the EPA has recently further lowered the human health toxicity values for GenX to a more protective standard.

171.    Further, like PFOA and other PFAS compounds, GenX is persistent in the environment, not readily biodegradable, and mobile in the presence of water.

172.    DuPont acknowledged in the same brochure referenced above that GenX "is chemically stable and, if released, would be environmentally persistent."

173.    Following the 2015 Chemours Separation and Spin Transaction, Chemours took over production of legacy DuPont PFAS chemistry, including GenX.

174.    Like DuPont, Chemours has, since 2015, designed, manufactured, marketed, distributed, and sold its PFAS compounds, including GenX, for use in AFFF products.

175.    On information and belief, the remaining Defendants also knew, or should have known, that in its intended and common use, PFAS-based AFFF and/or AFFF component products would injure and/or threaten the environment and public health.  This information was accessible to each of them, including as part of their ongoing involvement in various trade associations

31

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

constituted for the purpose of defending the AFFF franchise, including the Firefighting Foam Coalition ("FFFC").

176.     Additionally, all Defendants knew or, at a minimum, should have known that their PFAS-based AFFF and/or AFFF component products, given their chemical composition, easily dissolve in water (and indeed the products were designed to be mixed with water and sprayed on the ground), are mobile, resist degradation, and tend to bioaccumulate and biomagnify.

177.     Despite their knowledge of the harmful properties of PFAS chemicals, following 3M's withdrawal from the PFOA/PFOS market beginning in or around 2000, DuPont and the other Defendants made renewed commitments to protect their lucrative AFFF lines of business.

178.     In response to concerns expressed by the EPA regarding the environmental viability of AFFF, the FFFC was formed in 2001, partly to dispel such concerns. DuPont was a founding member. At least Tyco/Ansul, Chemguard, National Foam, and Dynax are current members.

179.     The FFFC lobbied hard for AFFF. At conferences, in journals, and in meetings with the military, the EPA, and other regulators, it repeated a key talking point: only one PFAS chemical, PFOS, had been taken off the market. Thus, the FFFC asserted, since the FFFC members' products did not contain PFOS (but rather PFOA and other PFAS chemicals, which Defendants knew or, at a minimum, should have known were equally harmful to the environment and public health), their products were safe.

180.     DuPont and other Defendants eventually transitioned to the use of short-chain fluorotelomers with a maximum of six carbon atoms, claiming those chemicals are safer to environmental and human health.

181.     Even if such claims were true, Defendants could have begun much earlier to transition from long-chain to short-chain fluorotelomers. Their failure to avail themselves of what

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

they claim is a feasible alternative to the then-current formulations of PFAS-based AFFF that substantially mitigates the risk of human and environmental harm from AFFF products only confirms that their products based on long-chain fluorotelomers were not reasonably safe for their intended applications.

182.    Moreover, effective fluorine-free firefighting foams that do not pose the same risks to human health and the environment as Defendants' products exist and are used in some of the world's largest airports, including London Heathrow, London Gatwick, Copenhagen, Stuttgart and Dubai, amongst others.

183.    All 27 of Australia's airports have been using fluorine-free foams for many years.

184.    Indeed, leading fire safety and regulatory experts have opined that there are simply no justifications for continued use of toxic foams given this successful, widespread use of the environmentally safe alternative.

185.    According to a report issued by a panel of experts of IPEN, a global network of public interest NGOs dedicated to the reduction of toxic chemicals, fluorine-free firefighting (F3) foams are viable alternatives to fluorinated AFFF and comparable by all measures.

186.    But unlike fluorinated foams, F3 foams do not pollute the environment indefinitely, or put human or animal health at risk; there is no expensive clean up; remediation costs are negligible or zero; and there are no significant legal and financial liabilities. Public health values such as clean drinking water are not compromised, and, finally, there is no erosion of public confidence in political institutions and government agencies.

187.    Defendants failed to adequately research and investigate the design, manufacture, or sale of fluorine-free firefighting foam, or did so and concealed their results. They avoided fluorine-free alternatives to protect their existing, lucrative AFFF lines of business.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

188.    Defendants' failure to pursue this feasible alternative to PFAS-based AFFF further confirms that their AFFF products were not reasonably safe for their intended applications.

E.    **DEFENDANTS' AFFF PRODUCTS HAVE CAUSED (AND CONTINUE TO CAUSE) WIDESPREAD PFAS CONTAMINATION IN AND AROUND THE BOROUGH.**

189.    Defendants' PFAS-based AFFF products have been used for decades at locations and facilities throughout Pennsylvania, including in the Borough and surrounding areas in which Borough water and other resources are located.

190.    Indeed, PFAS-based AFFF and AFFF component products manufactured by Defendants were in heavy use for decades at the former Willow Grove Naval Air Station Joint Reserve Base in Horsham Township, Pennsylvania (the "Willow Grove Base") and the former Naval Air Warfare Center in Warminster Township, Pennsylvania (the "Warminster Base" and, together with the Willow Grove Base, the "Bases").

191.    The Bases have been linked to the widespread contamination of surface waters and groundwater, as well as public drinking water wells, with PFOA, PFOS, and other PFAS. Indeed, PFAS compounds, including PFOA, PFOS, PFBS, PFHpA, and/or PFHxS, have been detected in the groundwater and drinking water on and near the Bases in the thousands (and tens of thousands) of ppt.

192.    During routine training exercises, PFAS-based AFFF was sprayed directly on the ground and/or tarmac at several fire training areas at the Bases, allowing PFAS to travel to the surrounding groundwater, causing widespread contamination, including of various Borough water supply wells.

193.    Additional releases of AFFF have occurred at the Bases through testing of the equipment and other incidental releases in hangars, fire stations and other locations.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

194.    At any given time during their operation, the Bases housed thousands of gallons of AFFF concentrate manufactured by Defendants, stored in buckets, drums, tankers, tanks and sprinkler systems.

195.    The use of AFFF for training purposes at the Bases included suppressing fires and explosions on the ground, as well as coating runways in anticipation of difficult landings, all of which resulted in acres of foam-covered soil and blanketed wreckages.

196.    On information and belief, PFAS-based AFFF was also used at numerous other locations in and near the Borough, including at airports, helipads, local firefighting training grounds, and industrial facilities known to have utilized AFFF products on-site.

197.    During firefighting and firefighting training exercises at or near these and other sites, PFAS-based AFFF was likewise sprayed, per its intended use, directly on or near the ground, causing it to be disposed, spilled, and otherwise discharged into the environment.

198.    These activities, at the Bases and other locations, resulted in discharges or releases of PFAS from Defendants' AFFF products into nearby surface waters, groundwater, soil, and air, as well as water infrastructure including the Borough's drinking water supply, stormwater system, and wastewater treatment works.

199.    In short, the normal, intended, and foreseeable manner of storage, use, and disposal of Defendants' AFFF products directly resulted in the discharge or release of PFAS into, onto, and near the Borough's environmental and infrastructural resources, causing injury to the Borough and its residents.

200.    Upon information and belief, PFAS-based AFFF and/or AFFF component products designed, manufactured, marketed, provided, supplied, sold, and/or distributed by each Defendant

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

were discharged or released into the environment at or from the Bases and other sites referenced above.

201.     The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not fully or sufficiently describe the human and animal health and environmental hazards of PFAS-based AFFF about which Defendants knew or should have known.

202.     The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings and instructions concerning the environmentally safe use and disposal of PFAS-based AFFF that were known or should have been known to Defendants.

203.     The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products and/or AFFF component, if any, during the times relevant to the claims in this Complaint did not provide appropriate instructions regarding how to design a firefighting testing site, or what precautions are necessary to take at such testing sites, in a manner that would potentially eliminate or limit the release of PFAS into the environment, even though the hazards of failing to appropriately contain PFAS were known or should have been known to Defendants.

204.     For example, instructions to install a liner under a testing area or outfitting area test-sites with appropriate water filtration systems could have significantly contained the spread of PFAS into the environment.  Defendants knew this, but failed to warn or instruct anyone that their products should only be stored, used, and disposed in conjunction with an effective liner or catch

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00, The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

basin, or water filtration system capable of removing PFAS before it could contaminate natural resources and water infrastructure.

205.    The instructions, labels and/or material safety data sheets that Defendants provided with their AFFF and/or AFFF component products, if any, during the times relevant to the claims in this Complaint did not provide appropriate warnings of potential groundwater pollution with PFAS nor advised the AFFF user to install appropriate water filtration devices to protect the Borough's natural resources and properties, even though Defendants knew or should have known about the inevitability of groundwater, air, and soil contamination through the ordinary and intended use of their PFAS-based AFFF products and consequent adverse effects.

206.    As a result, PFAS contamination attributable to the use and disposal of Defendants' PFAS-based AFFF products now afflicts Borough resources and properties, including without limitation water conveyed and discharged through municipal stormwater systems, in drinking water supply systems, in wastewater treatment works, and surface waters in and near Borough resources.

207.    PFAS contamination was discovered in groundwater at the Bases in 2011 and offsite in 2014 when public drinking water supplies were sampled for unregulated contaminants.

208.    In July 2016, the Borough conducted sampling for PFOA and PFOS at five (5) of its water supply wells, specifically Well Nos. 2, 6, 7, 8 and 14, which are the wells closest to the Willow Grove Base. PFOS and PFOA were detected in all of these wells at concentrations of up to 22 ppt, combined.

209.    Since at least March of 2019, the Borough has regularly tested each of its water sources (Well Nos. 2, 4, 6, 7, 8, 9, 11, 12, 14), storage tanks (Loch Alsh Tank, Broad Axe Tank, Houston Road Tank), and the Whitemarsh Water Treatment Plant for PFOS and PFOA at

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

significant cost to the Borough. The Borough's April 2021 drinking water well testing showed concentrations of PFOA and PFOS, combined, at up to 26 ppt. These contaminants were also detected at the Whitemarsh Water Treatment Plant at up to 16 ppt.

210. PFAS contaminants inevitably are also present in the Borough's other water infrastructure and other public natural resources. Indeed, given the mobility and persistence of PFAS compounds, these contaminants have certainly entered the Borough's stormwater system, overseen and managed by the Borough pursuant to the Borough's MS4 Discharge Permit, and continually recirculate through storm events.

211. PFAS contaminants have also been detected in surface waters and other natural resources in and near the Borough, including most recently in fish taken from the Neshaminy Creek basin.

212. Because of these PFAS detections, in October 2021, PA DEP issued a "do not eat" fish consumption advisory based on PFAS contamination levels, recommending that fishermen practice only catch-and-release and that no species taken from the entire Neshaminy Creek basin be consumed by humans.

213. The Borough has already incurred significant costs in connection with, among other things, monitoring and analyzing PFAS contamination in Borough resources and properties.

214. The Borough's sampling activities to detect PFAS from AFFF in water infrastructure, waterbodies, and other resources and properties, are ongoing.

215. The Borough's obligations under impending federal and state environmental regulations to identify, monitor, assess, analyze, and prevent, mitigate, remove or remediate PFAS contamination of its water infrastructure and public and natural resources are considerable and imminent.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

216.    PFAS contamination attributable to AFFF further threatens the health of Borough residents and the viability of the Borough's ecosystems.

217.    In short, the Borough and its residents have suffered and will continue to suffer injuries as a result of Defendants' conduct, including without limitation past costs incurred to monitor, sample, evaluate, assess, investigate, and analyze PFAS concentrations in the Borough's water infrastructure, waterbodies, and other resources and properties; future costs to monitor, sample, evaluate, assess, investigate, and analyze PFAS concentrations in the Borough's water infrastructure, waterbodies, and other resources and properties; costs to control, reduce, or remove PFAS and to remediate or restore impacted resources; costs to educate and inform residents about PFAS issues; and loss of use of resources and property, including water infrastructure and surface waters and other public and natural resources.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## FIRST CAUSE OF ACTION
### PUBLIC NUISANCE

218.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this cause of action.

219.    Plaintiff brings this action in its governmental capacity, as trustee of public natural resources, pursuant to its police powers to prevent and abate pollution of the Borough's natural resources and hazards to the public health, safety, and welfare, and to the environment, and as owner, manager, and operator of the Borough's drinking water, stormwater, wastewater, and other water systems.

220.    Defendants designed, manufactured, distributed, marketed, and promoted PFAS-based AFFF products and/or AFFF component products in a manner that created or contributed to the creation of a public nuisance that is harmful to health and obstructs the free use of the Borough's water systems, waters, and public resources.

221.    Defendants intentionally designed, manufactured, distributed, marketed, and sold PFAS-based AFFF products and/or AFFF component products with the knowledge that they inevitably and foreseeably caused environmental contamination when used as intended.

222.    Defendants knew that their PFAS-based AFFF products and/or AFFF component products would likely end up in the Borough's water systems, waterways, waterbodies, and other public resources when used as intended, including in and around the Borough.

223.    Defendants' conduct and the presence of PFAS contamination in the Borough's water systems, waterways, waterbodies, and other public resources annoys, injures, and endangers the comfort, repose, health, and safety of others.

224.    Defendants' conduct and the presence of PFAS contamination in the Borough's water systems, waterways, waterbodies, and other public resources interferes with and obstructs

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

the public's free use and comfortable enjoyment of the Borough's waters for commerce, navigation, fishing, recreation, and aesthetic enjoyment.

225.   The presence of PFAS contamination in Borough water systems, waterways, waterbodies, and other public resources also interferes with the Borough's and its residents' interest in a healthy and ecologically sound environment.

226.   Defendants' conduct and the presence of PFAS contamination in Borough water systems, waterways, waterbodies, and other public resources is injurious to human, animal, and environmental health.

227.   An ordinary person would be reasonably annoyed or disturbed by the presence of toxic PFAS that endanger the health of fish, animals, and humans and degrade water quality and marine habitats.

228.   The seriousness of the environmental and human health risk far outweighs any social utility of Defendants' conduct in designing, manufacturing, marketing, distributing, and selling PFAS-based AFFF products and AFFF component products and concealing the dangers posed to human health and the environment.

229.   The rights, interests, and inconvenience to the Borough and general public far outweighs the rights, interests, and inconvenience to Defendants, which profited heavily from the manufacture and sale of PFAS-based AFFF products and AFFF component products.

230.   Defendants' conduct caused and continues to cause harm to the Borough.

231.   The Borough has suffered and will continue to suffer damage from Defendants' PFAS-based AFFF products and AFFF component products.

232.   Defendants knew or, in the exercise of reasonable care, should have known that the design, manufacture, marketing, distribution, and sale of PFAS-based AFFF products and AFFF

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the
Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

component products causes the type of contamination now found in the Borough's water systems, waterways, waterbodies, and other public resources.

233.    Defendants knew that PFAS would contaminate water supplies and infrastructure, degrade marine habitats and endanger birds and animals, as a result of the ordinary and intended use of their products.

234.    In addition, Defendants knew PFAS and PFAS-based products are associated with serious illnesses and cancers in humans and that humans may be exposed to PFAS through ingestion of contaminated water, fish or other foods, and/or dermal contact.

235.    Defendants' conduct in designing, manufacturing, distributing, selling and promoting PFAS-based AFFF products and AFFF component products constitutes an unreasonable interference with a right common to the general public, i.e., the right to freely use the Borough's water systems, waterways, waterbodies, and other public resources without obstruction and health hazard.

236.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Borough and the public about the human and environmental risks posed by its PFAS products, and each day on which they fail to do so constitutes a new injury to the Borough.

237.    The Borough suffered harm of a kind different from that suffered by members of the general public, including the costly damage to its municipal water infrastructure, which it operates and/or maintains for the public welfare.

238.    As a direct and proximate result of Defendants' creation of a public nuisance, the Borough has suffered, and continues to suffer, monetary damages to be proven at trial.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## SECOND CAUSE OF ACTION
### DEFECTIVE DESIGN

239.   Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this cause of action.

240.   Plaintiff brings this action in its governmental capacity, as trustee of public natural resources, pursuant to its police powers to prevent and abate pollution of the Borough's natural resources and hazards to the public health, safety, and welfare, and to the environment, and as owner, manager, and operator of the Borough's drinking water, stormwater, wastewater, and other water systems.

241.   At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling PFAS-based AFFF products and AFFF component products.

242.   Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe as designed at the time the products left Defendants' control.

243.   The toxicity, solubility, volatility, persistence, bioaccumulative tendency, and inability of PFAS compounds to be contained rendered Defendants' PFAS-based AFFF products and AFFF component products unreasonably dangerous at all times.

244.   Defendants' PFAS-based AFFF products and AFFF component products were unsafe as designed.

245.   Due to their toxicity, persistence, volatility, solubility, and inability to be contained, among other things, Defendants knew their PFAS products were not safe at the time they were manufactured because, even when used as intended, such products would inevitably produce significant environmental contamination.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

246.   Defendants knew or should have known their PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person because of the overwhelming seriousness of creating pervasive environmental contamination, especially of groundwaters and surface waters, which serve as drinking water supplies, in the Borough and beyond.

247.   Defendants designed, manufactured, distributed, sold, and promoted PFAS-based AFFF products and AFFF component products despite such knowledge in order to maximize their profits despite the known harm.

248.   At all times relevant to this action, feasible alternatives to PFAS-based AFFF products were available to Defendants, which could have eliminated, reduced, or mitigated the unreasonable dangers and hazards posed by the AFFF products as designed.

249.   Any utility allegedly provided by the use of PFAS-based AFFF products and AFFF component products is greatly outweighed by the risks and dangers associated with their use.

250.   The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that they were toxic, persistent, bioaccumulative, water- and fat-soluble, and volatile (i.e., inevitably escaping their ordinary and intended applications), which resulted in contamination of waterways, wildlife, drinking water supplies, and water infrastructure, including within the Borough.

251.   The PFAS compounds released from Defendants' AFFF products reached the Borough's water infrastructure, waters, and other public resources without any substantial change in condition and were in the same condition at the time of the alleged injury to the Borough's resources.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

252.    It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach the Borough's water infrastructure, waters, and other public resources.

253.    Contamination of the Borough's water infrastructure, waters, and other public resources occurred because of the defective design and manufacture of the PFAS-based AFFF products and AFFF component products.

254.    Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to the Borough.

255.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Borough and the public about the human and environmental risks posed by its PFAS products, and each day on which they fail to do so constitutes a new injury to the Borough.

256.    The Borough has suffered and will continue to suffer damages in amounts to be proven at trial.

257.    Defendants are strictly liable for all damages arising out of their defectively designed PFAS-based AFFF products and AFFF component products.

### THIRD CAUSE OF ACTION
### FAILURE TO WARN

258.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this count.

259.    Plaintiff brings this action in its governmental capacity, as trustee of public natural resources, pursuant to its police powers to prevent and abate pollution of the Borough's natural resources and hazards to the public health, safety, and welfare, and to the environment, and as owner, manager, and operator of the Borough's drinking water, stormwater, wastewater, and other water systems.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

260.    At all relevant times, Defendants were in the business of designing, engineering, manufacturing, developing, marketing, and selling PFAS-based AFFF products and AFFF component products.

261.    Defendants' PFAS-based AFFF products and AFFF component products were not reasonably safe because they lacked adequate warnings at the time the products left Defendants' control.

262.    At the time Defendants designed, manufactured, distributed, sold, and promoted its PFAS-based AFFF products and AFFF component products, Defendants knew or should have known that, even when used as intended, such products would inevitably and foreseeably produce significant environmental contamination.

263.    Despite Defendants' knowledge, Defendants failed to provide adequate warnings that their PFAS-based AFFF products and AFFF component products would become a pervasive contaminant and contaminate drinking water supplies, waterways, and wildlife, including in the Borough.

264.    Defendants could have warned of this certainty but intentionally concealed the certainty of contamination in order to maximize profits.

265.    Defendants concealed the dangers of PFAS and PFAS-based products after they designed, manufactured, distributed, promoted, and sold them, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote and sell PFAS-based products without adequate warnings or instructions.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

266.    Without adequate warnings or instructions, Defendants' PFAS-based AFFF products and AFFF component products were unsafe to an extent beyond that which would be contemplated by an ordinary person.

267.    Defendants knowingly failed to issue warnings or instructions concerning the dangers of PFAS and their PFAS-based products in the manner that a reasonably prudent manufacturer would act in the same or similar circumstances.

268.    The PFAS-based AFFF products and AFFF component products were placed in the stream of commerce and sold by Defendants in a defective and unreasonably dangerous condition in that their design failed to include warnings or instructions sufficient and necessary for the safe and proper use and disposal of the products.

269.    The PFAS compounds released from Defendants' AFFF products reached the Borough's water infrastructure, waters, and other public resources without any substantial change in condition and were in the same condition at the time of the alleged injury to the Borough's water systems, waters, and other public resources.

270.    It was foreseeable to Defendants or a reasonable manufacturer that the PFAS would reach the Borough's water infrastructure, waters, and other public resources.

271.    Contamination of the Borough's water infrastructure, waters, and other public resources occurred because of the defective PFAS-based AFFF products and AFFF component products, in that to be non-defective and reasonably safe for use, the products should have contained or been accompanied by a warning as to their toxicity, persistence, bioaccumulativity, and volatility.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

272.     Further, such contamination occurred because of Defendants' failure to adequately warn or instruct their customers as to proper disposal techniques and safeguards necessary to prevent environmental contamination resulting from the ordinary use of such products.

273.     Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to the Borough.

274.     Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Borough and the public about the human and environmental risks posed by its products, and each day on which they fail to do so constitutes a new injury to the Borough.

275.     The Borough has suffered and will continue to suffer damages in amounts to be proven at trial.

276.     Defendants are strictly liable for all damages arising out of their failure to provide adequate warnings and instructions

## FOURTH CAUSE OF ACTION
### TRESPASS

277.     Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this count.

278.     Plaintiff brings this action in its governmental capacity, as trustee of public natural resources, pursuant to its police powers to prevent and abate pollution of the Borough's natural resources and hazards to the public health, safety, and welfare, and to the environment, and as owner, manager, and operator of the Borough's drinking water, stormwater, wastewater, and other water systems.

279.     As alleged above, Defendants designed, manufactured, distributed, marketed, and promoted PFAS-based AFFF products and AFFF component products in a manner that ensured

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

that PFAS compounds would invade the Borough's stormwater systems, drinking water supply systems, wastewater treatment works, waterbodies, and other public and natural resources.

280.    As a result of such invasion, the Borough's stormwater systems, drinking water supply systems, wastewater treatment works, waterways and waterbodies, and other public and natural resources which the Borough operates and maintains for the public welfare, suffer contamination with toxic PFAS.

281.    Defendants knew that it was a substantial certainty that PFAS would end up in the Borough's water infrastructure, waterways, water bodies, sediments, and fish and animal tissues, when Defendants' products were used as intended, including in the Borough.

282.    Defendants acted intentionally while knowing, or having reason to know, that Defendants did not have authorization to act in a manner that would cause injury to the Commonwealth's public natural resources.

283.    Defendants' conduct caused and will continue to cause injury to the Borough.

284.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Borough and the public about the human and environmental risks posed by its products, and each day on which they fail to do so constitutes a new injury to the Borough.

285.    As a direct and proximate result of Defendants' trespass, the Borough has suffered, and continues to suffer, monetary damages to be proven at trial.

## FIFTH CAUSE OF ACTION
### NEGLIGENCE

286.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this count.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

287.   Plaintiff brings this action in its governmental capacity, as trustee of public natural resources, pursuant to its police powers to prevent and abate pollution of the Borough's natural resources and hazards to the public health, safety, and welfare, and to the environment, and as owner, manager, and operator of the Borough's drinking water, stormwater, wastewater, and other water systems.

288.   Defendants had a duty of care to protect others against unreasonable risks resulting from the use or disposal of their PFAS-based AFFF products and AFFF component products.

289.   Defendants breached their duty by failing to conform to the requisite standard of care when they negligently, carelessly, and recklessly designed, manufactured, formulated, handled, stored, labeled, instructed, controlled (or failed to control), tested (or failed to test), marketed, sold and otherwise distributed toxic PFAS-based products that contaminated the Borough's water infrastructure, waters, and other public and natural resources.

290.   Defendants failed to exercise ordinary care because a reasonably careful company that learned of its product's toxicity would not manufacture that product or would warn of its properties.

291.   Defendants failed to exercise ordinary care because a reasonably careful company that learned that its product could not be contained during normal production and use would not continue to manufacture that product or would warn of its dangers.

292.   Defendants failed to exercise ordinary care because a reasonably careful company would not continue to manufacture PFAS-based AFFF products in mass quantities and to the extent that Defendants manufactured them.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

293.    There is a proximate causal connection between Defendants' breach of their duty of care and the resulting harm to the Borough's water infrastructure, waters, and other public and natural resources.

294.    Defendants' negligence caused and continues to cause injury to the Borough.

295.    Defendants are under a continuing duty to act to correct and remediate the injuries their conduct has introduced, and to warn the Borough and the public about the human and environmental risks posed by their products, and each day on which they fail to do so constitutes a new injury to the Borough.

296.    The Borough has suffered and will continue to suffer damages in amounts to be proven at trial.

## SIXTH CAUSE OF ACTION
### VIOLATION OF HSCA, 35 P.S. § 6020.507

297.    Plaintiff realleges and reaffirms each and every allegation set forth in paragraphs 1-217 as if fully restated in this count.

298.    Plaintiff brings this cause of action pursuant to HCSA, 35 P.S. § 6020.507.

299.    Under § 6020.507(a), "a person who causes a release or threat of a release of a hazardous substance [among other things] . . . shall be liable for the response costs and for damages to natural resources."

300.    Section 507 provides that "a municipality which undertakes to abate a public nuisance under this act or take a response action may recover those response costs and natural resource damages in an action in equity brought before a court of competent jurisdiction." § 6020.507.

301.    HSCA's definition of "hazardous substance" includes "[a]ny element, compound or material which is . . . [d]etermined to be substantially harmful to public health and safety or the

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

environment based on a standardized and uniformly applied department testing procedure and listed in regulations proposed by the department and promulgated by the Environmental Quality Board." § 6020.103.

302.    As further alleged herein, PFAS, particularly PFOA and PFOS, are toxic substances that pose significant risk to public health and the safety of the environment.  PA DEP has proposed regulations for PFOS and PFOS, including with respect to drinking water and soil.

303.    PFOS and PFOA constitute hazardous substances under the Act.

304.    HSCA defines "person" as "[a]n individual, firm, corporation, association, partnership, consortium, joint venture, commercial entity, authority, interstate body or other legal entity which is recognized by law as the subject of rights and duties." § 6020.103.

305.    Defendants are persons under HSCA.

306.    Unlike other Pennsylvania environmental statutes, HSCA does not further define "municipality."  Plaintiff is a Pennsylvania Borough duly organized under Pennsylvania law.  The Borough is a municipality under HSCA.

307.    By Defendants' conduct, including their manufacture, use, distribution, marketing, promotion, and sale of PFAS-based AFFF products and AFFF component products in a manner Defendants knew or had reason to know would, and did, cause or contribute to the contamination with PFAS of natural resources, including water and air, in and around the Borough, creating hazards to human and environmental health, including natural resources, Defendants caused a release or threat of a release of PFAS, and Defendants are liable to the Borough under Section 6020.507 as a result.

308.    At the time Defendants designed, manufactured, distributed, sold, and promoted their PFAS-based AFFF products and AFFF component products, Defendants knew or should have

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

known that, even when used as intended, such products would inevitably and foreseeably be released into the environment during their ordinary and foreseeable commercial use and thereby cause significant environmental contamination.

309.    Despite Defendants' knowledge, Defendants failed to provide adequate warnings about their products' toxicity and environmental hazards.

310.    Defendants concealed the dangers of PFAS and PFAS-based products after they designed, manufactured, distributed, promoted, and sold them, and did not issue adequate warnings or instructions to those who had previously purchased their products, and thereafter continued to design, manufacture, distribute, promote and sell PFAS-based products without adequate warnings or instructions, inevitably and foreseeably causing their products' continued release into the environment during their ordinary and foreseeable commercial use.

311.    The PFAS compounds, including PFOA and PFOS, released from Defendants' AFFF products reached the Borough's water infrastructure, waters, and other public natural resources without any substantial change in condition and were in the same condition at the time of the alleged injury to the Borough's water systems, waters, and other public resources.

312.    Defendants' PFAS-based AFFF products and AFFF component products caused and continue to cause injury to the Borough in the form of costs incurred to abate the nuisance created by their products, costs incurred to undertake a response action to their products' contaminating presence in Borough water infrastructure and public natural resources, and injuries in the form of natural resource damages inflicted by PFAS contamination.  These costs include the costs of response actions such as monitoring and assessing Borough water infrastructure and public natural resources for the presence of PFAS; any remediation of PFAS contamination of Borough water infrastructure, properties, or public natural resources; the costs of restoration, and loss of use

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

and loss of aesthetic or inherent value; and costs of pursuing this litigation to vindicate and safeguard the Commonwealth's public natural resources.

313.     The Borough has suffered and will continue to suffer damages in amounts to be proven at trial.

## **PRAYER FOR RELIEF**

Plaintiff prays for judgment against Defendants, jointly and severally, as follows:

1.     Damages in excess of $50,000 according to proof;

2.     Punitive or exemplary damages sufficient to punish Defendants' use of fraudulent, malicious, or evil intent or actions and deter or warn others against commission of similar misconduct;

3.     An award of past, present, and future costs to investigate, assess, analyze, monitor, remediate, restore, and/or replace natural resources and associated ecosystem services impaired or injured due to Defendants' conduct alleged herein;

4.     Declaratory judgment and injunctive relief requiring Defendants to abate and/or pay for abatement of the ongoing public nuisance, including all future abatement techniques necessary to protect the public health and the integrity and quality of public resources in the Borough;

5.     All relief and remedies available to Plaintiff under HSCA, 35 P.S. §§ 6020.101, *et seq.*;

6.     Litigation costs and attorney's fees as permitted by law;

7.     Pre-judgment and post-judgment interest;

8.     Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial.

Respectfully submitted,

**THE BOROUGH OF AMBLER**

Dated: December 13, 2021          /s/ *Viola Vetter*

Jay W. Eisenhofer (*pro hac vice* to be filed)
Kyle J. McGee (*pro hac vice* to be filed)
Viola Vetter (PA ID 207266)
Jason H. Wilson (PA ID 208112)
GRANT & EISENHOFER P.A.
123 S. Justison Street
Wilmington, DE 19801
Tel.: (302) 622-7000
Fax: (302) 622-7100
jeisenhofer@gelaw.com
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

*Attorneys for Plaintiff the Borough of Ambler*

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

Case# 2021-24289-0 Docketed at Montgomery County Prothonotary on 12/13/2021 12:03 PM, Fee = $290.00. The filer certifies that this filing complies with the provisions of the Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records of the Appellate and Trial Courts that require filing confidential information and documents differently than non-confidential information and documents.

## **VERIFICATION**

I, Mary Aversa, Borough Manager of the Borough of Ambler, Pennsylvania, hereby verify that the statements and allegations contained in the foregoing pleading are true and correct to the best of my knowledge, understanding and belief. I understand that false statements made herein are subject to the penalties of 18 PA. C.S, Subsection 4904, relating to unsworn falsification to authorities.

Date:   12/13/2021

Mary Aversa, Borough Manager
Ambler Borough Hall
131 Rosemary Avenue
Ambler, PA  19002

## CERTIFICATE OF SERVICE

I, Jason A. Levine, hereby certify that on January 12, 2022, I caused a true and correct copy of the foregoing document to be filed via the Court's Electronic Case Filing (ECF) system, which will send a notification to all counsel of record, and paper copies will be sent to those indicated as non-registered participants on this date as follows:

Via Electronic Mail:

Jay W. Eisenhofer
Kyle M. Mcgee
Viola Vetter
Jason H. Wilson
Grant & Eisenhofer, P.A.
123 S. Justinson Street
Wilmington, DE 19801
jeisenhofer@gelaw.com
kmcgee@gelaw.com
vvetter@gelaw.com
jwilson@gelaw.com

*Counsel for Plaintiff*

Via First Class Mail:

3M COMPANY
3M CENTER
BLDG 220-9E-02
ST. PAUL, MN 55133

ARCHROMA US INC
5435 77 CENTER DR #10
CHARLOTTE, NC 28217-0725

BASF CORP
100 PARK AVENUE
FLORHAM PARK, NJ 07932

CARRIER GLOBAL CORP
13995 PASTEUR BOULEVARD
PALM BEACH GARDENS, FL 33418

CHEMICALS INCORPORATED
12321 HATCHERVILLE ROAD
BAYTOWN, TX 77521

CORTEVA INC
974 CENTRE ROAD

AGC CHEMICALS AMERICAS INC.
5 EAST UWCHLAN AVENUE, SUITE 201
EXTON, PA 19341

ARKEMA INC
900 1ST AVENUE
KING OF PRUSSIA, PA 19406

BUCKEYE FIRE EQUIPMENT CO
110 KINGS ROAD
KINGS MOUNTAIN, NC 28086

CHEMDESIGN PRODUCTS INC
2 STANTON ST
MARINETTE, WI 54143-2543

CLARIANT CORP
4000 MONROE ROAD
CHARLOTTE, NC 28205

DEEPWATER CHEMICALS INC
196122 E COUNTY ROAD 40

BLDG 735
WILMINGTON, DE 19805

WOODWARD, OK 73801

DUPONT DE NEMOURS INC
EI DU PONT DE NEMOURS AND CO
974 CENTRE ROAD
WILMINGTON, DE 19801

DYNAX CORP
79 WESTCHESTER AVENUE
POUND RIDGE, NY 10576

KIDDE PLC INC
9 FARM SPRINGS ROAD
FARMINGTON, CT 06032

KIDDE-EINWAL INC
400 MAIN STREET
ASHLAND, MA 01721

NATIONAL FOAM INC
350 EAST UNION STREET
WEST CHESTER, PA 19382

RAYTHEON TECHNOLOGIES CORP
870 WINTER STREET
WALTHAM, MA 02451

THE CHEMOURS CO
THE CHEMOURS CO FC LLC
1007 MARKET STREET
WILMINGTON, DE 19899

UTC FIRE & SECURITY AMERICAS CORP INC
13995 PASTEUR BLVD
PALM BEACH GARDENS, FL 33418

_/s/ Jason A. Levine_
Jason A. Levine